

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF VERMONT 2021 NOV 15 PM 4: 07

CLERK

BY _____ LAW
DEPUTY CLERK

| | |
|---|---|
| **BENJAMIN MORLEY** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No.:** |
| ) | |
| **STATE OF VERMONT,** ) | **5:21-cv-272** |
| **GOVERNOR'S WORKFORCE** ) | |
| **AND EQUITY AND DIVERSITY COUNCIL ,** ) | |
| **VERMONT DEPT OF HUMAN RESOURCES,** ) | **VERIFIED COMPLAINT** |
| **VERMONT DEPARTMENT OF AGING AND** ) | **FOR DAMAGES,** |
| **INDEPENDENT LIVING,** ) | **DECLARATORY RELIEF** |
| **VERMONT DIVISION OF VOCATIONAL** ) | **AND INJUNCTIVE** |
| **REHABILITATION,** ) | **RELIEF** |
| **ALLISON  LAND, in her individual and official** ) | **AND DEMAND FOR JURY** |
| **capacity** ) | **TRIAL** |
| **HIBBARD DOE, in his individual capacity** ) | |
| **ELIZABETH HARRINGTON, in her individual** ) | |
| **and official capacity** ) | |
| **DIANE DALMASSE, in her individual and** ) | |
| **official capacity** ) | |
| **KAREN BLAKE-ORNE, in her individual and** ) | |
| **official capacity** ) | |
| **HEATHER BATALION, in her individual and** ) | |
| **official capacity,** ) | |
| ) | |
| **Defendants.** ) | |

The plaintiff, Benjamin Morley, ("Morley") moves this Honorable  Court for entry of

judgment in his favor against the Defendants, and in support of such Complaint avers as

follows:

## INTRODUCTION

1.   This action stands on three bedrock constitutional principles, enshrined in the First and

Fourteenth Amendments of the United States Constitution, namely, the principles of

equality, religious freedom, and  freedom of speech.

2. Morley, a vocational rehabilitation ("VR") counselor at the Vermont Division of Vocational Rehabilitation, ("DVR") has been subjected to adverse employment actions by his government employer because of his race and gender. He has been shamed, humiliated, reprimanded, excluded from assignments and leadership positions, and threatened with termination, because he is a white male. Furthermore, Morley and hundreds of his colleagues at DVR have been subjected to mandatory ideological "Diversity, Equity and Inclusion" ("DEI") "trainings". The "trainings" which espoused racist principles, classifying persons by race into dominant ("privileged") and subservient ("lack of privilege") groups. Those actions violate the Fourteenth Amendment to the U.S. Constitution which provides that all persons are created equal under the law, and therefore cannot be treated differently by the government because of their inherent traits. ("Classifications of citizens based solely on race [or other inherent traits] are by their nature odious to a free people whose institutions are founded upon the doctrine of equality…") *Shaw v. Reno*, 509 U.S. 630, 631, 113 S. Ct. 2816, 2818, 125 L. Ed. 2d 511 (1993).

3. The mandatory DEI "trainings" were unconstitutional religious and political indoctrination imposed by the government defendants. In addition, DVR and the various government defendants are planning to institute an "equity audit" which will condition Morley's and his colleagues' employment on whether they "buy in" to the State's DEI religious and political credenda. DEI is a dogma sincerely held by DEI proponents, based on unverifiable and unfalsifiable principles the proponents believe are the essence of an upright life, and require a lifetime of "work" to achieve. DEI thus bears the hallmarks of a religion *Patrick v. Lefevre,* 745 F.2d 153, 157 (2nd Cir. 1984),

being imposed on employees *Equal Opportunity Emp. Comm'n v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377 (E.D.N.Y. 2016).  The First Amendment to the U.S. Constitution prohibits any government agency from requiring any person to profess to any government imposed dogma, be it religious or political.  ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.")  *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S. Ct. 1178, 1187, 87 L. Ed. 1628 (1943).

4. Furthermore, Morley has suffered adverse employment actions by DVR and various other State defendants because he has publicly spoken out about the DEI trainings mandated by the State—a topic of great public interest and concern. Those adverse employment actions violate the First Amendment to the United States Constitution which requires that no person can be punished by the government for voicing his opinion on matters of public concern.  ("[I]t has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.") *Connick v. Myers*, 461 U.S. 138, 142, 103 S. Ct. 1684, 1687, 75 L. Ed. 2d 708 (1983).

5. The Defendants' actions also violate Article VI of the U.S. Constitution, prohibiting a religious test for government employment, by requiring Morley to adhere to the religious doctrine of DEI.

6.   The Defendants' actions also violate  the federal Hatch Act, (5 U.S.C. § 1502). The DEI

trainings exhorted Morley and his colleagues to support and donate funds to various

politically progressive organizations. The Hatch Act prohibits direct or indirect advice

urging government employees to support or donate to political organizations.

7.   The Defendants have violated the Vermont Fair Employment Practices Act 21 V.S.A. §

495 et. seq. by creating a hostile work environment based on Morley's gender and race,

and by imposing a religious orthodoxy on Morley and his colleagues.

8.   Plaintiff is asking this court to declare such actions by the Defendants to be

unconstitutional and unlawful, to enjoin the Defendants from engaging in such

indoctrination, from instituting the audit process, and from conditioning Plaintiff's

employment on his adherence to the State's credenda.  Finally, Plaintiff requests

damages from various defendants in their personal capacities for willful violation of his

constitutional and statutory rights.

9.   The term "Diversity, Equity and Inclusion" used by the government defendants is a

misnomer.  The indoctrination imposed by the government defendants espouses neither

diversity, equity, or inclusion, but is a racist and dehumanizing dogma which seeks to

require participants to "buy into"  "anti-racist" ideology through a teaching technique of

exploitation of personal emotions and group peer pressure.  Because the terms are

misused, it is important to outline specifically what the DEI trainings at DVR

advocated; hence the reason for the length of this complaint.

## NATURE OF ACTION AND JURISDICTION

10.   Plaintiff realleges all the preceding numbered paragraphs

11.   This is a civil action under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 seeking injunctive,

declaratory relief against the State of Vermont, ("State")  the  Governor's Workforce

and Equity and Diversity Council, ("Workforce Council") the Vermont Department of

Human Resources, ("HR") the Vermont Department of  Disabilities, Aging, and

Independent Living ("DAIL")  and the Vermont Division of Vocational Rehabilitation

("DVR") ,  Elizabeth Harrington ("Harrington"), Allison Land, ("Land") Diane

Dalmasse ("Dalmasse"), Karen Blake-Orne, ("Blake-Orne") and  Heather Batalion

("Batalion") in their  official capacities, and for monetary damages against Defendants

Hibbard Doe ("Doe"), Land, Harrington, Dalmasse, Blake-Orne, and Batalion in their

individual  capacities, for committing acts, under color of law, with the intent and for

the purpose of depriving Plaintiff of rights secured under the Constitution and laws of

the United States and the State of Vermont.  This case arises under the United States

Constitution and 42 U.S.C. Sections 1983 and 1988, as amended.  This Court has

jurisdiction in this matter pursuant to  28 U.S.C. §§ 1331 and 1343.  This Court has

authority to issue a declaratory judgment, to order injunctive relief, attorneys' fees and

other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202, and 42

U.S.C. §§ 1983 and 1988.  This Court also has pendent jurisdiction in Plaintiff's state

law claims against various defendants.

12.   This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C.

1391(b)(1) and (b)(2). The actions complained of took place in this judicial district, and

the Plaintiff and all the Defendants reside in this judicial district.

## **PARTIES**

13.   Plaintiff  Morley is a resident of Orleans, Orleans County, Vermont, and is presently

employed by the Vermont Department of Vocational Rehabilitation ("DVR") in

Newport, Vermont as an adult vocational rehabilitation ("VR") counselor. His employment is permanent and not probationary.

14. Defendant State is a sovereign state of the United States of America, and is subject to suit for declaratory and injunctive relief within the meaning of 42 U.S.C. § 1983, and the Vermont Fair Employment Practices Act ("VFEP"), 21 V.S.A. § 495 et. seq.

15. Defendant Workforce Council is a state government council and is subject to suit for Declaratory and Injunctive relief within the meaning of 42 U.S.C. § 1983 and is responsible for recommending trainings and materials for State employees regarding DEI and, upon information and belief, facilitated and/or implemented the DEI trainings at DVR, and implementing the "equity audit" to be imposed on Plaintiff and his colleagues at DVR.

16. Defendant Department of Human Resources ("HR") is a Department of the State of Vermont, and is subject to suit for Declaratory and Injunctive relief within the meaning of 42 U.S.C. § 1983. It is a named defendant because it has implemented a mandatory Diversity, Equity and Inclusion ("DEI") program for Plaintiff and his colleagues at the DVR and is one of the entities planning to perform an equity audit on Plaintiff and other state employees as part of the continuing DEI program.

17. DAIL is a Department of the State of Vermont, and is subject to suit for Declaratory and Injunctive relief within the meaning of 42 U.S.C. § 1983. It is a named defendant because it has implemented a Diversity, Equity and Inclusion program for DVR, and is one of the entities planning to perform an equity audit on Plaintiff and other state employees as part of the continuing DEI program.

18.   DVR is a division within DAIL.  Both are subject to suit for Declaratory and Injunctive
      relief within the meaning of 42 U.S.C. Section 1983,  and VFEP.  DAIL has
      implemented a DEI program for all employees at DVR that is racist, sexist, and violates
      Plaintiff's First Amendment rights, and it plans to continue the DEI program by means
      of an equity audit.

19.   During all times relevant to this lawsuit, Defendant Land was and is the Human
      Resources Administrator at HR and was and is responsible for implementing the DEI
      program at DVR.

20.   During relevant times related to this complaint, defendant Doe was DVR regional
      manager in Newport, Vermont, and supervised the staff, including VR counselors, at the
      DVR facility in Newport, Vermont.  Doe left that position on April 12, 2021 to take a
      position at DVR as field service manager, supervising three regional managers
      including the regional manager at DVR in Newport, Vermont.

21.   During all times relevant to this complaint, Harrington was DVR associate regional
      manager at the DVR facility in Newport, Vermont, and after Doe left the regional
      manager position on April 12, 2021, Harrington became DVR regional manager at the
      Newport facility. During all times relevant to this complaint, Harrington was either
      Morley's immediate supervisor, or, when promoted, his general supervisor.

22.   When Morley was first hired, Blake-Orne was also an adult rehabilitation counselor.
      After Harrington was promoted to regional manager, Blake-Orne was promoted to
      Newport senior counselor, and became Morley's immediate supervisor.

23.  During all times relevant to this lawsuit, Dalmasse was and is DVR Director, and has had supervisory authority over Morley, Doe, Harrington, and Blake-Orne. Dalmasse also is instrumental in implementing the DEI training and the proposed equity audit.

24.  During all times relevant to this lawsuit, Batalion is Vocational Rehabilitation Training Coordinator, and was instrumental in organizing the required DEI trainings, and is involved, upon information and belief, in the proposed equity audit. Batalion was also involved in the formation of the DAIL equity task force and equity committee.

25.  Defendants Land, Doe, Harrington, Blake-Orne, Batalion and Dalmasse in their personal capacities are persons subject to suit for declaratory and injunctive relief and for money damages within the meaning of 42 U.S.C. Section 1983, VFEP, and the Vermont Constitution.

## FACTS

## BACKGROUND

26.  Plaintiff realleges all the preceding numbered paragraphs.

27.  Plaintiff Morley began his employment as a VR counselor at DVR on November 24, 2019.

28.  A VR counselor's job description, according the DVR website, is "a collaborative effort between consumer and counselor to understand and adjust to disability, identify employment goals, and engage the resources needed to obtain and maintain stable employment."

29.  DVR's Mission is "to help Vermonters with disabilities prepare for, obtain, and maintain meaningful careers and to help employers recruit, retain and promote employees with disabilities." *Exhibit 1—DVR Values and Mission*

30. Morley earned a bachelor's degree, *cum laude,* from Johnson State College, and a master's degree in public administration from Norwich University.

31. Prior to his position at DVR, Morley was employed at the Vermont Department of Corrections ("DOC") as a Recreation Services Coordinator for a period of five ½ years.

32. The State of Vermont provides uniform employee evaluation forms for its employees, which include a performance ratings ranging from Outstanding, Excellent, Satisfactory, and Unsatisfactory. At DOC, Morley's ratings were 100% Outstanding

33. Morley's DOC supervisors' comments concerning his performance at DOC included such comments as "outstanding to say the least"; "leads with enthusiasm, dedication, integrity"; "true team player"; "demonstrated commitment, honesty, integrity"; "employs foresight, creativity, adaptability; " and "high level of professionalism and fantastic work ethic."

34. In 2016, when Morley was age 27, Morley was awarded Administrative Support Services Employee of the Year by the State of Vermont.

35. When Morley first began his employment at the DVR facility located in Newport, Vermont, he held the position of associate adult counselor (termed Counselor I) because he did not have a master's degree in counseling. Associate adult counselor remains his position presently. Morley was and is the only male VR counselor at DVR in Newport.

36. Morley's duties involve counseling DVR consumers to introduce them to employment and training opportunities to assist them in gaining appropriate employment commensurate with their skills.

37. Morley's caseload typically consists of 75 to 85 VR consumers.

38. At DVR, Morley has had above average success helping his consumers find jobs, compared to other VR counselors statewide, according to DVR's five indicators for measuring consumer outcomes, as outlined in employee evaluations.

## WORKPLACE GENDER DISCRIMINATION

39. During the entire time Morley has been employed at DVR, he has been frequently subjected to harassing comments by his female colleagues critical of Morley's gender, with barbs about "toxic masculinity" and "mansplaining". One female colleague told Morley to watch a Netflix series on feminism so that he would learn about his masculinity. In the morning staff meetings, female staff members constantly criticized male employees as not "getting it". Morley stopped going to those meetings due to the constant criticism of male employees.

40. Approximately two months after Morley was hired, he was required to take a two week medical leave because of a persistent medical problem. The following week after his return to work, Morley received a Facebook message from Cindy Vincent-Goodyear, the DVR administrative assistant in Newport, saying "you had better get your fucking shit together and start communicating with your team. I am not hearing good things from them."

41. Since Morley's return following his medical leave, Doe, Harrington, Blake-Orne and others have repeatedly commented on the fact Morley was out for two weeks and therefore is not properly trained or skilled to counsel consumers. Other employees who have taken leave have not been subjected to similar comments related to job performance.

42. Despite the comments that Morley has not been adequately trained,  Morley has been unable, despite his numerous requests, to  receive training or mentoring from his immediate supervisors. For example, Doe asked Harrington to train Morley in the AWARE caseload management software program.  Harrington did not provide the training, so Morley had to reach out to Doe, who tasked a VR counselor from St. Albans to provide the training.

43. Harrington, whose duties include meeting with the VR counselors on case reviews, has refused to meet with Morley. When Harrington became regional manager, she told all the counselors that she had an "open door", and that any VR counselor could meet with her and ask her questions. In fact, she places on her calendar "open door" times when counselors are able to meet with her.  Morley has frequently tried to meet with Harrington during her "open door" times, but she has either declined to meet, or has scheduled a meeting and then cancelled.

44. Case review meetings are recommended for associate VR counselors because associate counselors do not have security clearance to enter eligibility dates, individualized plan for employment (IPE) dates or closure dates for their consumers.  These dates are necessary to progress consumer cases and to remain compliant with federal deadlines for case management.  Non-compliance with deadlines negatively impacts VR counselors' evaluations. Because Morley has had difficulty in getting responses from Harrington, he has had to make additional efforts to  obtain a timely response so that he could be in compliance with the federal deadlines.  Other counselors have not had similar issues.

45. In contrast to Morley's experience, female VR counselors were and are able to meet with Harrington.  At staff meetings when Harrington is present, Harrington responds to female counselors' questions, but refuses to answer any of Morley's questions.  Morley has given up asking Harrington questions at staff meetings.

46.  On February 1, 2021, at a staff meeting, Morley suggested a method of providing orientation to new consumers using YouTube—a method which he thought would be more effective than the current orientation method.  Doe agreed the proposal was a good one, and others at the staff meeting also agreed.

47. Harrington, who at the time was senior counselor and Morley's immediate supervisor, was present at the meeting.  On February 5, 2021, Harrington emailed Doe expressing that many of the staff members in the office viewed his agreement with Morley about the orientation suggestion as "sexist".  She stated that Doe only agreed with Morley because he was a male.

48. On February 8, 2021, Doe sent Morley an email regarding Harrington's statements, and said he would address them at the next meeting on February 9th.

49. On February 9, 2021, Doe, Harrington and Morley met.  Doe apologized for agreeing with Morley about the proposed orientation initiative.  At the meeting, Morley raised the issues of being repeatedly demeaned because of his gender.  Harrington defended her comments by saying her comments cannot be "sexist" or racist", because whether it is male or female, or a Black or white person, it is a "power thing".  Her implication was that female sexist remarks about a male were not sex discrimination.

50. Morley experienced discrimination concerning the assignment of consumers to him as a male counselor.  DVR's method of assigning consumers to a counselor involve a

meeting with all counselors, including senior counselors and regional managers, to

discuss and determine who should be referred to each individual VR counselor. The VR

counselors have dubbed these meetings as "jobsville."

51. After Blake-Orne became senior counselor, during several "jobsville" meetings, Blake-

Orne and Harrington commented on particular consumers whom they said should not

have a male counselor, and Morley would not be assigned that consumer.

52. During a meeting with DVR's Linking Learning Careers team, AT Specialist Laurie

Cook and Youth Employment Consultant Jennifer Cote stated that "Ben should not

meet alone" with one of Morley's current female consumers.  Laurie Cook commented

that she was concerned that "something would happen" between Morley and the

consumer because the consumer was "sexually charged".  Jennifer Cote continues to

comment to Morley about his potential liability if he was to meet with that consumer

alone.  The implication was that Morley, as a man, is incapable of acting professionally

with a female consumer.

53. Morley protested at several staff meetings about these comments by female staff about

his gender. He specifically complained that the comments about his relationship with

the particular female consumer Cook and Cote mentioned at the Linking Learning

Careers meeting, implied that, as a man, he was not capable of acting professionally, or

capable of counseling female consumers. Morley stated that he could work with female

consumers, and he requested that he be assigned referrals regardless of the gender of the

consumer. His complaints were ignored or dismissed by the other members of the

group, including his supervisors.

54. Morley also complained that he was assigned consumers who had been difficult in the past, even though he was relatively new at the job, and had less experience in DVR counseling than the female counselors. Again, these comments were ignored.

55. Morley has repeatedly complained to management and to HR about the hostile work environment. His complaints have been ignored.

## MANDATORY DIVERSITY EQUITY AND INCLUSION TRAINING

56. In 2020, HR began a process of implementing a DEI program for DVR employees that eventually resulted in fifteen and one half hours of DEI training by Mirna Valerio ("Valerio").

57. Land, as HR field manager, was personally involved in implementing the DEI program for DVR.

58. Upon information and belief, Batalion and Dalmasse negotiated the DEI contract with Valerio and the Mirnavator LLC, Valerio's corporate entity, to provide 13.5 hours of Diversity, Equity, Inclusion and Anti-Racism training for DVR. Valerio was also to provide an additional two hours on Class, Class Consciousness, and Classism. The DEI contract was signed by Batalion, Dalmasse and Monica White, the Commissioner for DAIL. The trainings were set to begin on March 29, 2021. [*Exhibit 2—Valerio and Mirnavator contract*]

59. At DVR quarterly meetings, Dalmasse frequently speaks of her pride in DVR's DEI program, and expresses the need to continue "the work".

60. The DEI contract provided that Valerio and Mirnavator were to be paid up to $45,000 for the trainings.

61. The DEI contract was signed by all parties by May 19, 2021, one month after Valerio had completed the trainings provided in the contract.

62. Beginning on March 29, 2021, Morley and all other employees of DVR, including administrative staff, VR counselors, benefits counselors, and assistive technology specialists, consisting of approximately 250-300 participants, were required to attend trainings on DEI led by Valerio. The DEI trainings were completed on April 19, 2021.

63. The trainings were mandatory for all DVR employees.

64. The trainings were set up, organized and monitored by Batalion.

65. The overwhelming majority of participants were white.

66. The first training was entitled "Intro to Identity and Social Justice Training". The second training was entitled "Whiteness and Antiracism".[1] Each training session was held over a period of two days, totaling four work days, and 13.5 hours.

67. The training presenter, Valerio, has no background in human resources, vocational rehabilitation, psychology, sociology or related fields. She attended, but did not graduate, from the Oberlin School of Music, and taught Spanish in various private schools for a number of years. She has a website dedicated to running, called the Mirnavator, was named National Geographic Adventurer of the Year, and was on the

---

[1]     In addition, Valerio did later conduct a two hour training on "Class and Classism".

cover of Runner's World magazine.   During the trainings, Valerio described herself as an "entrepreneur".

68.   As part of the training, Valerio presented other speakers, each of whom she described as her "friend".   None of the speakers had background in human resources, vocational rehabilitation, psychology, sociology or related fields.

69.   A video tape of the trainings was produced for the participants.   The video tape totaled 4.5 hours, and did not include most breakout sessions, as well as some other material. However, the video tape appears to include all the major themes Valerio presented.

[*Exhibit 3-transcription of videotaped portion of the first four training sessions*]

70.   Valerio began the training session with the following statement:

"I know we will have a great time although its hard stuff, sometimes it is very very heavy but I like to approach this with a sense of joy and hope; so thank you for taking the time to be here today and trusting me to lead you all through this experience on what is an urgent topic… Before we delve into the work, How are you feeling emotionally and physically, where are you in your body?  How are you feeling in your bodies.  It's really important work to continually check in with yourself because a lot of our emotional stuff a lot of the work we do is manifested physiologically; to be able to observe ourselves when we are heated up or riled up and just know that is what is happening to our bodies and spirits and minds is a good practice

71.   She then asked  participants to share their feelings with the group.

72.   After the group shared their feelings, Ms. Valerio said:

"I appreciate your willingness to perhaps be uncomfortable today; and to discuss some potentially difficult things with colleagues that maybe you know, maybe you don't know but most importantly  to embody that we in the work call critical humility, critical humility, which is this understanding that we are all in a learning space or sometimes we call it the learning edge, giving grace to ourselves, grace to other people,  as we delve into this really difficult topic… It's a blessing to lead people to the work, and to push them into a new realization."

73.  At the beginning of each training session, Valerio stated that she would not take
     questions.  She explained questions "so often serve to derail the work", that "sometimes
     the questions are very self-serving", and "people ask questions to stop the progress of
     the group, or to argue".

74.  Throughout the trainings, Valerio encouraged people to reveal personal private
     information about themselves, including their ethnicity, race, religion, political views,
     sex, gender, sexual orientation, gender identity, and personal and family history.

75.  Valerio repeatedly encouraged participants to "check in" with their emotions, telling
     them they should practice "knowing what is happening to our bodies, spirits and
     minds", to be "aware of your body language" and "your vulnerability". She said that
     the participants "have to keep peeling off layers and layers of yourself". She expressed
     how emotionally difficult the trainings were.

76.  Near the beginning of the first training session,  Valerio posted the following phrases on
     a  Power Point slide:

     "White/whiteness

     White people/white privilege

     White supremacy/White supremacist ideology

     The White Community"

77.  She then asked the group "what is your reaction what is the feeling in your body,
     feeling in your mind emotionally."

78.  Participants replied with words such as  "angry', "guilty" "sad and angry" "anxious"
     "knots in my stomach".

79. Valerio read those responses aloud and commented:

"Wow.  Thank you Thank you for sharing.  If you do find discomfort,  and anger and defensiveness in hearing those phrases, you simply sit with that discomfort in this class and practice critical humility; that is why that notion exists; specifically when we are feeling these feelings; you know part of this work is leaning into that discomfort, this space of learning.  So, thank you for sharing."

80. Valerio repeatedly stated how emotionally difficult and "exhausting" the trainings were, and continued to encourage participants to "lean into the discomfort"

81. Valerio repeatedly referred to "the work" throughout the trainings.  Valerio used the word "work" over 60 times to refer to" the work" the participants needed to do to become anti-racist.  She stated that the dismantling racism requires "introspection and reflection; conflict and discomfort, cognition and emotions, and unlearning harmful ideologies".  She then made it clear that such emotional "work" was required of white persons only, because she said the "work" means "dismantling all kinds of isms—white supremacist ideology from which many isms are derived."  Valerio further stated that "advantage and disadvantage are based purely on skin color,"  and that the participants should be "unlearning harmful ideologies that we as a society have both internalized and perpetuated."

82. Valerio then said: "All of this work is carried under the umbrella of social justice." At the same time Valerio posted a PowerPoint slide which defined social justice as follows:

"All social identity groups participate fully in a society that…

Meets all of their needs

In which resources are equitably distributed and ecologically sustainable"

83.  This definition of social justice necessarily requires government to "meet all identity groups' needs" and to "equitably distribute" resources.  It is the antithesis of a democratic free market society where the goal is for all individuals to have equal opportunity, not equal outcomes determined by government.[2]

84.  Valerio further defined "social justice" as follows

"When you think about the ideology of white supremacy, which is the belief system that rationalizes, reproduces and normalizes white racial advantage and political government and social institutions; that is what power over is.  Another part of social justice is recognizing oppressive situations when you see them.  We do not do these without something called critical consciousness. Critical consciousness is knowing your identity very deeply so that you will have empathy, awareness of the impact of current and historical examples of racism and other isms and then developing an action plan for yourself."

85.  During the first four days of training that were videotaped, Valerio mentioned "race", "racism", "racist" or "racial" 113 times.

86.  Valerio said that "racism is real; it's not an opinion;  it's real; it's baked into the very fabric of society."

87.  Valerio said that  racism is "pervasive, meaning that it is omnipresent and in everything."

88.  Valerio stated,  "we all are in this society that was built upon the premise of white supremacist ideology."

89.  Valerio stated that the "most prominent cultural identifier is race; race is socially constructed category created to produce a hierarchy of skin color."

90.  Valerio said "race does play a huge part in systemic, institutional, individual, interpersonal advantage and disadvantage".

---

[2] To be sure, anyoneis entitled to voice her opinion, no matter how foolish or fanciful, erudite or profound.  But the State cannot impose those opinions on State employees.

91. In a Power Point slide, Valerio identified the different forms of racism:

**"Racism** is a **pervasive** system of advantage and disadvantage based on the socially constructed category of race
- Systemic, institutional, cultural, interpersonal/individual, covert and overt microaggressions, among others
- **Individual/interpersonal racism:** Prejudice or bias at an individual level.
- **Structural racism:** System of hierarchy and inequity, characterized by white supremacy--the **preferential treatment,** privilege and power for white people at the expense of Black people and other people of color
- **Institutional racism:** Policies, laws, rules, customs put in place by social and government institutions, that advantage whites as a group and disadvantage people of color
- **Social/cultural racism:** Social norms, roles, rituals/traditions, language, music and art that reinforce the belief that white culture is superior to other cultures.
- **Cultural appropriation:** Attitudes and behaviors go beyond appreciation and veer into appropriating the culture of marginalized groups
- **Microaggression:** Everyday verbal, nonverbal, environmental slights, snubs, or insults, which communicate *hostile, derogatory, or negative messages* to target persons based solely upon their social group membership. (Dr. Derald Wing-Sue)
  - CAN occur re all identities
- **Color-blindness/Color evasiveness: "I am color blind" or "I don't see color"**
  - Race UNEQUALLY shapes life chances, opportunities, everyday life

**Other iterations of Racism**
- **Covert/Overt Racism**
- **Collusion**
- **Internalized Racism: see Candace Owens**
- **Internalized Dominance**
- **Stereotype threat**
- **Orientalism"**

92. Valerio stated that "structural racism" is "privilege and power of white people at the expense of people of color" and "institutional racism" is "policy, laws, rules, customs that are put in place by organizations, governments, that advantage whites and disadvantage people of color."

93. During the entire portion of the videotaped trainings, Valerio provided few examples to

support her claims of systemic all pervasive racism in the United States, none of which
supported her sweeping claims.

94.   First, Valerio provided three examples of institutional and structural racism.  In one
example, she cited a 1934 federal law which she said "red zoned" areas where Black
Americans and immigrants lived; and she said that law still affects Black housing today.
She provided no analysis or context, but simply stated as a fact that "red-zoning" is an
example of systemic racism. The issue is far more complex and nuanced, but such
complexity does not fit Valerio's goal of indoctrination through shaming and
humiliation.  https://glennloury.substack.com/p/the-truth-about-redlining.   Valerio also
did not mention that redlining has been illegal in this country for nearly a half a century.
Moreover, this example was not related to Vermont, nor to DVR's mission, nor VR
counselors' job description.

95.    In the second example, Valerio said there is a "disproportionate number of black men
in the criminal justice system".  Valerio provided no analysis of this fact, but blamed it
solely on white structural racism and white supremacy. She said that "slavery was
replaced by incarceration and still continues to today", and that "private entities are
making a lot of money off this prison industrial complex system; it's called free labor."
While this example may have a tangential relationship to DVR's work, Valerio did not
make any connection with DVR's mission.

96.   In the third example, Valerio cited the deaths of 13 Black Americans in the last eight
years, the majority as a result of police confrontations.    She provided no context and
no analysis of the deaths.  Instead, Valerio used those few examples to conclude there
are "many many many more [deaths] at the hands of systemic racism, overt and covert

racism, all this being the result of white supremacist ideology that is in the very fabric

of our society." None of the examples were related to Vermont, or to DVR's mission.

97.  In addition, these examples do not support her conclusion. The latest FBI statistics

from 2017show that 80.2% of white victims were killed by white offenders, 8.9% of

Black victims were killed by whites, 88.5% of Black victims were killed by Blacks, and

16.1% of whites were killed by Blacks.

98.  As examples of interpersonal racism Valerio cited personal anecdotes from her own

life. None of those anecdotes involved any racial slurs, loss of employment

opportunities or benefits, or loss of educational or career opportunities. They all

involved off hand comments that were years, if not decades, apart, that Valerio

interpreted as racist.[3]

99.  Valerio stated that cultural racism means "assumptions about what is good and evil,

what is beauty, what is ugly, beautiful or ugly; what is normal, what is not normal; what

is an acceptable perspective on time; whiteness, earliness. If you exist outside of these

norms it is problematic, right?" She gave only one example as to "cultural racism": she

said Black women in the military "have had to cut their hair, put relaxers in their hair

or been not allowed to braid their hair because those things look unprofessional."

Moreover, Valerio did not mention that there are grooming requirements for white and

Black men which are arguably stricter than the examples she gave. Finally, her

example of military requirements concerning grooming related to Black women was

also inaccurate. Two months before her lectures, the Department of Defense changed

its standards for grooming, allowing such hairstyles.

---

[3] Every human who has lived beyond infancy has been subjected to slights, petty cruelties, inadvertently unkind remarks by people who are jealous, angry, miserable, thoughtless, or just had a bad day. This has nothing to do with race, except the human race.

https://www.army.mil/article/242719/revised_army_regulation_and_grooming_standards_support_diversity_equity_and_inclusion_and_people_first_priority .

100. Valerio cited prominent Black conservative commentator Candace Owens, as Valerio's one example of "internalized racism". She said of Owens; "if you have never heard of her, look her up. I am not going to talk about her anymore. She's an idiot."

101. Valerio spoke of white models wearing cornrow hair or bantu knots as examples of cultural appropriation.

102. Valerio used one personal example of "microaggression:"--when people complimented her teenage son. Valerio said: "My son gets it all the time, 'you're so well spoken.' Wow."

103. Valerio said that being color blind "perpetuates racism."

104. Valerio stated: "There's [sic.] so many more  types of racism but I am going to stop here. All of these reach, in very insidious ways, into our lives in everything that we do, in how we think, and how we act, who we are in our community, who we are in a community with."

105. Valerio stated that the "whole idea" of the nuclear family was "pushed on us" implying that the nuclear family was a construct of white supremacy.

106. In sum, her examples provided no evidence that racism pervades every aspect of American life or that America is pervasively white supremacist.

107. Valerio's claims about all pervasive racism in this country is therefore based on ideology and belief, not on facts.

108. Valerio exhorted participants to become "anti-racists."

109. Valerio defined anti-racism as follows: "So to define it, what it really is; anti-racism

means achieving social justice with regard to racial identities.  So, as in social justice

work…It is the active process; the work never ends; it is the active process of

identifying and eliminating racism by changing our systems, our organizational

structures, our policies and practices and attitudes so that this power is redistributed and

shared equitably, right?  Anti-racism is probably in our lifetimes work that is not going

to be done; it is not going to be finished because undoing structural, institutional,

cultural individual and interpersonal racism is ongoing work."

110. Valerio stated that part of the "ongoing work" includes "root[ing] out the people who

aren't doing better" in the organization.

111. During her entire trainings on racism,  Valerio never mentioned any Black Americans

of accomplishment, except for Candace Owens, as noted above, and a poem by Maya

Angelou.

112. Therefore, if a participant in the trainings knew nothing about Black Americans, he or

she would come away with the conclusion that Black Americans are merely people who

have been violently victimized by encounters with white people, mostly police, and are

not achievers or prominent players in American life.

113. Valerio's view of the Black American community was patronizing and condescending.

She claimed that Black Americans cannot achieve success unless white Americans

change their thoughts and actions, embrace "anti-racism" ideology, and advocate for

"social justice".

114.  Valerio denigrated Black Americans by claiming that *all* their problems were as a

result of white supremacy—implying Black Americans are helpless and dependent on

white Americans for their success in life.  It is the very definition of racism—a form of

white supremacy; the same view of American Blacks held by white slaveholders to justify slavery in the antebellum South.

115. The entire training consisted of progressive political doctrine. At no time did Valerio mention conservative or Republican policies related to minority communities, such as school choice, secure borders, and safe communities, all policies supported by the majority of Black Americans, and advocated by Republicans and conservatives. At no time did she mention Dr. Martin Luther King or his advocacy for a color blind society.

116. At the end of the fourth day of trainings, Valerio stated: "And then the final part of this day will be on strategies, or bringing anti-racism work into your life."

117. Valerio stated that, as part of the "anti-racism" work, the participants must be engaging in "critical consciousness". She said: "Critical consciousness is knowing your identity very deeply so that you will have empathy, awareness of the impact of current and historical examples of racism and other isms and then developing an action plan for yourself; Critical humility is knowing we are in that learning space."

118. Valerio set out a plan of action for the participants to engage in "the work". She outlined the plan in a Power Point presentation as follows:

**"Strategies**

Talking about racism and NAMING it in whatever form it might take doesn't make you a racist, ignoring it does, tho.
Speak up, speak out.
Awareness: Do a deep dive into the community you live in. Know why it looks the way it does.
Look at your circle of friends
Give money AND time
CONTINUE YOUR LEARNING
Be part of task forces/strategic planning
Get to know your DEI execs/leaders at your work and in your filed. ASk how you can help be a part of their initiatives.

Listen to Black people, legitimize, hear our experiences without questioning whether or not they really happened.

VOTE Be active at a political level/local politics

Check your own behavior and actions--have you committed microaggressions? How would you change that in the future?"

119. Valerio prodded the participants: "Speak up. Speak out! We are utilizing our influence and our privilege in our communities and our work spaces has an effect.  I really believe in the ripple effect.  Be active at a political level.  If there is a racist sheriff, or a sexist person that is in your local community that you can vote out."

120. Valerio said: "If you have kids, talk to them about race and racism...Have a plan for disrupting micro-aggressions and other aggressions; challenge the folks at your dinner table.  It's hard, it's very very hard."

121. Valerio exhorted participants to move along a continuum in their thoughts and attitudes from what she described as "color blindness" to "anti-racism".  Along that continuum, she told participants:  "When we are able to be meta cognitive about [racism]; I am feeling this guilt and shame now; a lot of people stayed there; You can also choose to move on and to keep on learning and to utilize those feelings of guilt and shame to further examine yourself and your own privilege and channel those emotions into constructive and positive ways to move along this continuum of social justice or anti-racism."

122. Valerio also provided participants with links to materials for them to read. [*Exhibit 4-Course-Specific Resource List*]  She encouraged them to read the  materials.  Those materials consisted of entirely politically progressive commentary and opinions.

123. There are no documents in the Resource List linked to the writings of conservative or classically liberal Black intellectuals like Dr. Thomas Sowell, Jason Riley, Dr. Carol

Swain, Dr. Randall Kennedy, Dr. William Julius Wilson, Clarence Thomas, Dr. Shelby

Steele, Dr. Glenn Loury, Dr. Walter Williams, Dr. Stephen Carter, Dr. Orlando

Patterson, Stanley Crouch, Dr. Anne Wortham and Robert Woodson,  all of whom

disagree strongly or find abhorrent the doctrines espoused by Valerio.  Instead there are

only links to persons with progressive and even radical totalitarian views, like Ta-

Nehisi Coates and Ibram X. Kendi.

124.   The Resource List contains links only to progressive political groups such as

raceforward.org, interactioninc.org, dismantlecollective.org, ractioncenter.org,

equityinthecenter.org and racialequitytools.org.  These organizations request money

donations and exhort people to political activism.

125.   In one document linked to the training session, Kendi advocates for a constitutional

amendment that would overturn our constitutional republic system and turn it into a

dictatorship of unelected racial equity  "experts" His proposed amendment states as

follows:

"The amendment would make unconstitutional racial inequity over a certain threshold, as well as racist ideas by public officials (with "racist ideas" and "public official" clearly defined). It would establish and permanently fund the Department of Anti-racism (DOA) comprised of formally trained experts on racism and no political appointees. The DOA would be responsible for preclearing all local, state and federal public policies to ensure they won't yield racial inequity, monitor those policies, investigate private racist policies when racial inequity surfaces, and monitor public officials for expressions of racist ideas. The DOA would be empowered with disciplinary tools to wield over and against policymakers and public officials who do not voluntarily change their racist policy and ideas." *How to Fix Inequality: Pass an Anti-Racist Constitutional Amendment, Politico Magazine,* © 2019.

126.   In another document linked to the training session, the Republican Party and its

members are denigrated as "mean spirited"…demonizing opponents, rejecting

compromise, embracing conspiracy theories".

127.  At Raceforward.org, the authors state that President Trump's order concerning the
      dissemination of critical race theory ("CRT") is as follows: "Trump's executive Order
      is anti-free speech, anti-American and anti-freedom. Yet if it is not rescinded, it could
      have a chilling effect on racial justice work far beyond federal government, potentially
      impacting businesses, arts institutions, schools, and universities. Join us in fighting to
      stop Trump's executive order!"

128.  In another document as part of the suggested reading, promoting Eyes on Whiteness
      podcast, it states "Eyes on Whiteness is a podcast that illuminates the insidious and
      ignorant ways of whiteness, regardless of intent. Our guests are invited to talk about the
      ways white supremacy and patriarchy are pervasive and ever-present."

129.  Another document for suggested reading, called "Resources for White Allies-Dismantle
      Collective" states: "White supremacy and racism are serious problems in our society
      that affect us all….the Dismantle Collective desires to be a starting point for white allies
      to do the work and engage in analysis, education, and action on anti-racism." The article
      repeatedly asks the reader to donate money to the Dismantle Collective.

130.  In a video linked to the training session, a speaker urges the audience to chant names of
      alleged victims of "police violence" while a singer sings the alleged victims' names, in
      a performance that is reminiscent of a religious revival. At the end the speaker states:
      "Together, we've come together to bear witness to these women's lost lives. But the
      time now is to move from mourning and grief to action and transformation. This is
      something that we can do. It's up to us."

131.  Another document linked to the training session, entitled "Timeline of Protests",
      outlined a list of allegedly racist attacks by white Americans against Black Americans,

starting in 1619.  The "Timeline" ends as follows:

**"May 27, 2020:** Minneapolis residents say:  'Fuck this.'

**May 29-present**: America says: 'Damn right, fuck this.'

**Now**: America reaps an infinitesimally microscopic fraction of the racist chaos, violence and lawlesness (sic.) it has sown.

Reap, motherfuckers."

132.  Therefore, the call to activism was a call to follow unquestionably progressive political positions, to actively support those positions, donate to these progressive organizations, and to oppose Republican and/or conservative political positions.

## PLAINTIFF'S EXPRESSION OF HIS SINCERELY HELD BELIEFS

133.  Morley believes that the United States is the most racially tolerant country in the world and affords more rights and freedoms to citizens than any other country. He believes that all Americans can achieve the American Dream. He believes that personal responsibility, hard work, honesty, and compassion for others are keys to finding happiness.  He believes that every person is equal to every other person. He understands and agrees that our society has flaws which need to be corrected, but those flaws are not caused by systemic or institutional racism. He believes in a pro-human approach to diversity and inclusion education, where individuals focus on their shared rights and responsibilities, and celebrate their diversity.  He believes all people should be provided an opportunity to share their diversity of opinion and personal belief without receiving undue pressure or targeting from others in an attempt to damage an individual's properties or reputation. He believes that people should be judged based on their actions and the content of their character, not the color of their skin.

134. At one breakout session during the DEI trainings where participants were required to discuss ways they "have privilege", Morley stated that he did not agree with the concept of white privilege, and that he did not believe the United States today was systemically racist. The others had all discussed their "white privilege" before Morley spoke.

135. Morley expressed to other colleagues at VR that he did not agree with the training and felt that the trainings did not allow diversity of opinion, and discriminated against white men and women, and minority groups.

136. Morley shared with the HR Representatives Land, and Kelly Knowlton, in two separate meetings, that he felt the DEI training was biased and was requiring staff members to comply and affirm with a specific ideology that was political in nature. He stated that he was concerned about how specific groups were being treated differently in the training based on their perceived race, and their designation in the oppressed and oppressor classes. Morley said that he was concerned about the language including phases that are subjective such as "white privilege" "systemic racism" "social justice" "color blindness" "whitewashing" etc. He said that that many people may have a diversity of opinions in relation to the content delivered as well as the relevance of these terms.

## DVR'S RESPONSES TO PLAINTIFF'S COMPLAINTS

137. Morley's colleagues reacted negatively to Morley's statements at breakout sessions during the DEI trainings.

138. After the training sessions were completed, Morley received a message on his personal cell phone from Cindy Vincent-Goodyear, the Administrator at DVR, suggesting to him that he should apply for a job opening outside of DVR. Upon information and

belief, Cindy's message was in response to Morley's expressed skepticism of the
ideologies espoused by Valerio at the training sessions.

139. On April 20, 2021, Morley was summoned to meet with Doe and Blake-Orne for a
performance evaluation. Although Doe had left his position, he was involved in
Morley's evaluation. The evaluation included an employee survey of Morley's
performance. The majority of those who took the survey said that Morley was "easy to
work with." A small percentage of survey-takers stated that Morley was "not good to
work with." Based on that small sample, Morley was told by Doe and Blake-Orne to
improve his social skills.

140. In response, Morley told Doe and Blake-Orne that he felt targeted by certain individuals
in the office, and that some individuals had not accepted him since the beginning.

141. Blake-Orne responded that his remarks were a "red flag", and that "it did not sit right"
with her because she believed the office was "very inclusive and supportive of everyone
that works there."

142. On April 22, 2021, Morley was summoned to meet with newly appointed regional
manager Harrington, and Blake-Orne again, this time for a "Supervisory Feedback".
At that meeting he was given a letter stating that during a group meeting organized by
Morley for the office's orientation project he had said that another colleague was
"brainwashed" concerning the "social justice training". That was a lie. Morley never
used the word "brainwash".

143. The "Feedback" stated as follows:

"Going forward, I am asking you to use better judgement and to refrain from
commentary and statements during work that do not foster a safe and inclusive work
environment. DVR is moving forward with DEI work, and these trainings are the
beginning of that work. DVR leadership feels this work is a core value of DVR and we

will continue the DEI track in the future. It is expected that you will take part in related training and/or projects and also not use language that causes your peers great discomfort.

Please note that DVR takes this behavior seriously and continuing to engage in this behavior may lead to disciplinary action, up to and including dismissal. "

144. Morley was told that the feedback would not be placed in his file, and he could not appeal.

145. On May 12, 2021, Morley wrote to Allison Land, HR administrator at the Department of Human Resources located in Waterbury, Vermont. In his correspondence, he stated that the April 22, 2021 "Feedback" from his supervisor was targeting him because of his race and sex, and because he spoke out against the DEI trainings. He also stated that the trainings targeted him as an "oppressor" because of his skin color.

146. Land responded that the feedback was not discipline and it could not be appealed.

147. At DVR, it is standard practice for supervisors to discuss with counselors any transfer of their consumers to other counselors. That has always been the practice with Morley prior to his complaints about the DEI trainings and the discriminatory conduct of the staff. However, in July and August, 2021, four of Morley's consumers were transferred to other VR counselors without his knowledge or consent. Morley repeatedly asked his supervisors for an explanation, but was ignored. As a result, he has not learned why they were transferred nor how to manage any of the issues for which they were transferred. This does not happen to other VR counselors in the office.

148. In July, 2021, Morley filed a Step II grievance, with his supervisor, Harrington, pursuant to the grievance procedure in the union contract between state employees and the State, outlining the discriminatory actions taken by DVR supervisors, including the

mandatory trainings noted above.  Harrington was required to respond within 5 days, pursuant to the grievance procedure.  She has never responded.

149.   On or about July 26, 2021, Morley published on two online news outlets a critique of the DEI trainings he was mandated to attend. [*Exhibit 5—Morley Commentary*]

150.  After that critique was published, Morley was subjected to more adverse employment actions.

151.  On August 2, 2021, for the first time, Morley's timesheets were questioned in writing by Harrington regarding his practice of placing reminders on his work calendar to stretch his neck and back. Morley had been putting such reminders on his calendar since he began work at DVR and the reminders were at the same time as scheduled meetings and work assignments.   Morley did the stretches while he worked, and was never questioned before about this practice. Harrington asked Morley what leave time he would be using for the times he used for stretching throughout the pay period.

152.   On August 6, 2021, Morley received a written reprimand and a threat to terminate his employment from Karen Blake-Orne for allegedly revealing confidential information. When he had notified a group of counselors and other consumer care providers of a case review, Morley had inadvertently failed to remove a care provider formerly employed at Northeast Kingdom Human Services. The notice did not provide any confidential information; only the initials of the consumers being reviewed. Ms. Blake-Orne also filed an incident report with the Agency of Human Services. This was a minor infraction which did not, in fact, reveal any confidential information.  Other counselors have made similar mistakes and have not been reported to the Agency of Human Services or received a written reprimand.

153. In August, Harrington referred several new consumers to a female counselor in another district, even though Morley had told her several times that he could take new referrals.

154. In September, 2021, another of Morley's consumers was transferred to another VR counselor without his knowledge.  On October 1, 2021,  Morley again brought up the issue with Harrington, telling her it was usual practice to discuss transfers with the counselor. Harrington replied she would use her discretion to remove cases and doesn't need to tell Morley why.

155. Morley is required to complete a master's program in rehabilitation counseling by the November 1, 2024 as part of his job qualifications.  Morley planned to start this fall, but decided not to begin until next semester. On September 12, 2021, Morley notified DAIL that he was postponing his master's program. On October 1, 2021, Blake-Orne sent Morley an angry "Written Supervisory Feedback", saying his failure to notify her was a "serious performance issue"—even though he had notified DAIL, and the completion of the educational requirement is three years away.

156. During discussions with his supervisors about the DEI training, several of Morley's supervisors stated that DVR planned to implement an "equity audit". They indicated that the equity audit would monitor employees to determine if they fully agree with the principles laid out in the DEI trainings. They further indicated that employee evaluations would be based, at least in part, on whether employees subscribed to the principles laid out in the trainings and their willingness to participate in "the work".

157. On June 28, 2021, Morley specifically asked at a staff meeting about whether the DEI trainings would have an impact on employee evaluations.  His supervisor, Harrington, did not reply.  However, later in the day she sent Morley this email:

> "As a request for future interactions, especially on video calls,
> Please respond verbally when I address you.

In our Newport staff meeting as I greeted you, you did not unmute or respond. You did not indicate acknowledgement of my 'hello' with a head nod, wave or any similar gesture.
It is the expectation you will engage with me, as facilitator of the staff meeting, and with the peers within the meeting.
You indicated your audio, video and internet connect was working properly when asked moments later."

158. On July 8, 2021, DAIL filed a Request for Proposals ("RFP") for a Diversity Equity and Inclusion Implementation Consultant for DVR.   This is the "equity audit" referred to by Morley's supervisors. [*Exhibit 6—RFP*]

159.  The RFP, in a section entitled "Purpose of Request", stated "DVR is committed to DEI in all aspects of our program.  To that end DVR is interested in contracting with a vendor that can assist the agency [to] implement a comprehensive approach to embedding DEI in all aspects of our organization and services."

160. The RFP includes a proposal that the bidder implement is "How DVR can incorporate DEI into staff supervision and evaluation."

161. The RFP goes on to state: "DVR recognizes that this is sensitive and difficult work that requires buy in from management and frontline staff."

162. The RFP further states: "The Bidder will demonstrate an understanding of the concept intersectionality: Intersectionality is a framework of understanding of how race, disability status, religion, gender identity, socio-economic status, and other social identities overlap and influence an individual's experience with DEI.  The intersection of specific characteristics creates unique challenges."

163. The RFP states the contract will last for two years, with possible renewals for an additional two years.  The contract costs are estimated to be approximately $60,000-$100,000 per year, but higher bids will be considered.

164. The RFP anticipates that the bidder will perform a "needs assessment" which it anticipates will include "focus groups" with staff and managers. These focus groups will provide DVR with information as whether participants are "buying in" to DEI.

165. The RFP proposes that the bidder will "develop a plan" to "incorporate DEI in all aspects of the program and organization," based on the "needs assessment".

166. The RFP proposes that the "Preferred Qualifications" for the contractor are as follows: "DVR will give preference for bidders with lived experience of diversity, equity and inclusion issues." There are no other preferred qualifications.  The message is unequivocal:  no white male need apply.

167. This proposed equity audit will, if the previous trainings are any indication, force Morley and other employees to confess their feelings about race, and to pledge to work towards "anti-racism" activism if they want to keep their jobs.

168. The RFP provides that the selection notification was to occur on September 7, 2021. Once the contract is completed, it will be posted on https://www.vermontbusinessregistry.com/BidSearch.  It has not yet been posted on the Vermont business registry.

169. Because the previous written contract with Valerio was not signed until after her trainings were completed, Morley is concerned that the equity audit contract will also not be posted before the scheduled October 28, 2021 start date.

## FIRST CLAIM FOR RELIEF
## EQUAL PROTECTION—RACE AND SEX DISCRIMINATION

170. Plaintiff realleges and incorporates all previous paragraphs.

171. Morley was subjected to repeated insults, and ridicule by his co-workers and his female

supervisors.  He was not afforded the training and mentoring that the female counselors
were provided.  His female supervisors would not assign him to certain consumers that
were assigned to female counselors. He has been reprimanded and threatened with
termination for infractions that are minor, or not infractions at all.  Female counselors
are not subject to the same type of discipline.

172.  Morley was subjected to a total of 15 hours of so-called "diversity, equity, and
inclusion"  training that subjected him to repeated insults and humiliation because of the
color of his skin.  He was told that as a white male American, he was "racist", and
"white supremacist".  He was told that because of his skin color, he had "privilege"
which he had to recognize and atone for.

173.  The Defendants are proposing instituting an "equity audit" to determine whether DVR
employees are "buying into" the "diversity, equity and inclusion" trainings.

174.  Upon information and belief, the proposed equity audit will publicly shame and slander
Morley and other white male Americans solely because of their gender and skin color.
Upon information and belief, the "audit" will be part of every employee's personnel
evaluation, which will determine continued employment, promotions and pay increases.

175.  All the Defendants have violated Morley's rights to equal protection under the 14th
Amendment to the United States Constitution, and there is immediate danger that the
discrimination will not only continue, but increase, by insulting, ridiculing and
intimidating him because of the color of his skin, and not providing him with benefits
and opportunities provided to female DVR counselors.

176.  There is no important governmental interest in treating employees differently because
of their perceived race or gender.

177. The Defendants' actions are not narrowly tailored to effectuate any important governmental interest.

178. Morley has been damaged by the Defendants' violation of his equal protection rights.

179. There is a danger that the discrimination will intensify with the institution of "equity audits".

**SECOND CLAIM OF RELIEF—VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE FREE SPEECH AND FREE EXERCISE CLAUSES OF FIRST AMENDMENT TO THE CONSTITUTION**

180. Plaintiff realleges all preceding numbered paragraphs.

181. The Free Speech Clause of the First Amendment to the United States Constitution provides as follows: "Congress shall make no law…abridging the freedom of speech…"

182. The Free Speech Clause of the First Amendment to the United States Constitution provides as follows: "Congress shall make no law…prohibiting the free exercise [of religion]…"

183. Amendment I is applicable to state and local governments under Amendment XIV of the United States Constitution.

184. The Supreme Court of the United States has repeatedly affirmed that the First Amendment includes a guarantee that a person has the right to think his own thoughts and have his own opinion free from intimidation or coercion.  ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances

which permit an exception, they do not now occur to us.")  *W. Virginia State Bd. of Educ.. v. Barnette*, 319 U.S. 624, 642, 63 S. Ct. 1178, 1187, 87 L. Ed. 1628 (1943)

185.   DVR employees, including Morley, were required to attend trainings that prescribed orthodoxies about race, racism, our society and government that no employee was allowed to question.

186.  These orthodoxies had nothing to do with employees' duties at DVR.

187.  Instead these trainings were indoctrination of a system of beliefs that America is a racist country, white Americans are, based on their skin color, white supremacists,  that color blindness is racist, and that white Americans must feel shame solely because of the color of their skin.  Moreover, the trainings espoused  progressive political views, to the total exclusion of other political views.

188.  Group guilt, rather than individual responsibility, was repeatedly stressed throughout the trainings.

189.  Disagreeing with these government imposed credenda has resulted in adverse employment actions against Plaintiff.

190.  DVR plans to implement the "equity audit" in which, according to RFP noted above, will condition future employment on how well employees "buy into" ideology pushed in the DEI  trainings. Upon information and belief, this equity audit will expose Plaintiff to further injury by conditioning his employment on how much he "buys into" the DEI ideology.

191.  In addition, Morley's Free Speech rights were violated when he was punished for speaking to his supervisors about his criticism of the DEI trainings, and when he wrote a public commentary about the DEI trainings.  Morley's commentaries about  DEI

training, were commentaries "upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the. ..[employee's] proper performance of his daily duties [in the workplace] ...or to have interfered with the regular operation of the ...[organization] generally." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 572–73, 88 S. Ct. 1731, 1737, 20 L. Ed. 2d 811 (1968).

192. Thus Morley's commentaries concerning DEI are protected by the First Amendment, and he cannot be sanctioned by his government employer for such commentary.

193. There is no compelling governmental interest for the Defendants' actions.

194. Even if there was a compelling governmental interest in promoting DEI, the Defendants actions against Morley are not the least restrictive means of effectuating that interest.

195. Morley has been damaged by the Defendants' violation of his First Amendment rights.

### THIRD CLAIM FOR RELIEF—DEPRIVATION OF PLAINTIFF'S CONSTITUTIONALLY PROTECTED RIGHT TO PRIVACY (42 USC SECTION 1983)

196. Plaintiff realleges all the preceding numbered paragraphs.

197. During the DEI trainings, Plaintiff and other employees at DVR were intentionally pressured by Valerio to reveal intimate details of their private lives, and their personal emotional feelings.

198. The right to privacy from government intrusion is protected by the First Amendment to the United States constitution. ("[T]he First Amendment has a penumbra where privacy is protected from governmental intrusion.") *Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S. Ct. 1678, 1681, 14 L. Ed. 2d 510 (1965)

199. The Defendants have violated Morley's right to privacy by intentionally pressuring state

employees to reveal their private thoughts and details of their private lives.

200. Morley has been damaged by the violation of his privacy rights.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION FIRST AMENDMENT FREE EXERCISE CLAUSE OF**
**OF THE U.S. CONSTITUTION.**

201. The Religion Clauses of the First Amendment to the U.S. provides as follows:

"Congress shall make no laws respecting the Establishment of Religion, or prohibiting

the Free Exercise thereof." These clauses are made applicable to the states by

Amendment XIV of the United States Constitution.

202. Morley holds sincerely held beliefs for which he is willing to pay a price in order to

follow the dictates of his conscience. Those beliefs include the fundamental principles

of our Founding documents: that all persons are created equal, with certain inalienable

rights; that we are all individuals, not part of a collective, that we all must be color blind

when judging a person's character, that hard work, a strong family and honesty, not the

color of one's skin, will result in a successful and happy life.. He rejects the ideology

that skin color and gender dictate whether or not one is successful, and that America is

pervasively and inherently racist. He believes that all lives matter in our country.

203. Morley has been the recipient of adverse employment actions, including reprimands and

threats to terminate his employment, and reduction in his caseload because of his

expressions of his sincerely held beliefs.

204. Limiting or sanctioning an individual's sincerely held beliefs violates the Free Exercise

Clause of the First Amendment to the U.S. Constitution. "[Religious belief] is a belief

finding expression in a conscience which categorically requires the believer to disregard

elementary self-interest and to accept martyrdom in preference to transgressing its

tenets... call it conscience or God, that is for many persons at the present time the equivalent of what has always been thought a religious impulse.") *United States v. Kauten*, 133 F.2d 703, 708 (2d Cir. 1943)

### FIFTH CLAIM FOR RELIEF
### VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE U.S. CONSTITUTION

205.  Plaintiff realleges all numbered preceding paragraphs.

206.  Valerio's trainings bear all the hallmarks of religious indoctrination.  She comes to conclusions that America is a pervasively racist white supremacist country, and that white Americans are inherently racist based on the color of their skin, with no empirical evidence to support that sweeping conclusion.

207.  Valerio countenanced no dissent.  She couched her lectures in terms of absolute truths.  For example, she said: "racism is real; it's not an opinion;  it's real; it's baked into the very fabric of society."

208.  Valerio repeatedly exhorted the participants to feel shame, guilt, and other uncomfortable emotions, rather than teaching them facts and evidence.

209.  Valerio urged the participants to action—not in relation to their work at DVR, but in their personal life, and in their interactions with friends and family.

210.  Valerio also said that this action will take a lifetime of "work".  ("Anti-racism is probably in our lifetimes work that is not going to be done;")

211.  Valerio's ideology claims that racism is pervasive, and omnipresent, and reaches, according to her, every aspect of every American's life.

212.  The U.S. Supreme Court has defined religious belief in terms strikingly similar to Valerio's belief system (" And if that word (God) has not much meaning for you, translate it, and speak of the depths of your life, of the source of your being, or your ultimate concern, of what you take seriously without any reservation.") *United States v. Seeger*, 380 U.S. 163, 187, 85 S. Ct. 850, 865, 13 L. Ed. 2d 733 (1965).

213.  The proposed equity audit will enforce those beliefs as a part of employee evaluations.

214.  This kind of state sanctioned mandatory training and the subsequent equity audit amounts to impermissible state entanglement in a religious faith.  Thus it violates the Establishment Clause of the First Amendment.

## SIXTH CLAIM FOR RELIEF—VIOLATION OF ARTICLE VI OF THE U.S. CONSTITUTION

215.  Plaintiff re- alleges all numbered preceding paragraphs.

216.  Article VI of the U.S. Constitution provides in pertinent part as follows:  "[N]o religious Test shall ever be required as a Qualification to any Office of public Trust under the United States." *U.S. Const. art*. VI.

217.  The mandatory trainings of DVR employees, and the proposed equity audit require that DVR employees adhere to an ideological doctrine that is fact free, and thus faith based, or be "rooted out", as Valerio stated, if they do not comply.

218.  This amounts to a religious test for any employee of DVR, and, therefore, a violation of Article VI of the U.S. Constitution. *Torcaso v. Watkins*, 367 U.S. 488, 81 S. Ct. 1680, 6 L. Ed. 2d 982 (1961)

## SEVENTH  CLAIM FOR RELIEF—VIOLATION OF THE HATCH ACT

219.  Plaintiff realleges all the numbered preceding paragraphs.

220.  The Hatch Act provides in pertinent part: "A State or local officer or employee may not

…directly or indirectly coerce, attempt to coerce, command, or advise a State or local

officer or employee to pay, lend, or contribute anything of value to a party, committee,

organization, agency, or person for political purposes;" *5 U.S.C. § 1502(a) (2).*

221.  At the state mandated trainings, Valerio and other speakers advised the participants to

become active in political issues, exhorting them to do "the work" to politically

transform this country into a country of "social justice", which means, according to

Valerio that everyone's needs are met, and "resources are equitably distributed and

ecologically sustainable."   This is a political goal espoused by countless progressive

organizations.  Valerio exhorted the participants to engage in political activism for the

rest of their lives to transform the country to her vision:  "So, as in social justice

work…It is the active process; the work never ends; it is the active process of

identifying and eliminating racism by changing our systems, our organizational

structures, our policies and practices and attitudes so that this power is redistributed and

shared equitably, right?  Anti-racism is probably in our lifetimes work that is not going

to be done; it is not going to be finished because undoing structural, institutional,

cultural individual and interpersonal racism is ongoing work."   Valerio also advised the

participants to "Speak up. Speak out! We are utilizing our influence and our privilege in

our communities and our work spaces has an effect.   I really believe in the ripple effect.

Be active at a political level.  If there is a racist sheriff, or a sexist person that is in your

local community that you can vote out."

222.  In addition, Valerio's recommended readings are linked to solely progressive

organizations that advise political activism and request money donations.

223.  These exhortations to donate monetary contributions to politically partisan

organizations violate the Hatch Act.

## SEVENTH CLAIM FOR RELIEF: VIOLATION OF VERMONT FAIR EMPLOYMENT PRACTICES ACT

224.  Plaintiff realleges and incorporates all the previous paragraphs.

225.  Vermont Fair Employment Practices Act provides in pertinent part:

"It shall be unlawful employment practice, except where a bona fide occupational qualification requires persons of a particular race, color, religion, national origin, sex, sexual orientation, gender identity, ancestry, place of birth, age, crime victim status, or physical or mental condition:

For any employer, employment agency, or labor organization to discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability;
Retaliation prohibited. An employer, employment agency, or labor organization shall not discharge or in any other manner discriminate against any employee because the employee:

has opposed any act or practice that is prohibited under this chapter." *21 V.S.A. § 495*

226.  Plaintiff has been subjected to a hostile work environment where has been ridiculed and

humiliated because of his gender and his race.

227.  Plaintiff has also not been provided with opportunities to counsel certain consumers

because of his gender.

228. When Morley complained to management, he was ignored, and retaliated against. Indeed, members of management engaged in the hostile work environment themselves.

229. In addition, the DEI trainings involve religious indoctrination, which constitutes discrimination on the basis of religion.

230. Therefore the Defendants have violated the Vermont Fair Employment Practices Act *21 V.S.A. § 495 et. seq.*

231. As a result of Defendants' actions, Morley has suffered ridicule, humiliation, and emotional distress.

### **PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Honorable Court:

    A. Enter a declaratory judgment that Defendants' mandatory DEI training and the proposed equity audit violates the First and Fourteenth Amendments to the US Constitution, and Article VI of the US Constitution.

    B. Enter a declaratory judgment that the Defendants' retaliation against Plaintiff for speaking out against political indoctrination violates Morley's First Amendment rights under both the Free Speech and Free Exercise Clause.

    C. Enter a declaratory judgment that Defendants actions urging employees to engage in progressive political activism and donate to progressive political causes violates the Hatch Act.

    D. Enter an order preliminarily and permanently enjoining Defendants from engaging in further political/religious DEI indoctrination, and in monitoring Morley and other state employees for their compliance with DEI dogma.

E.  Enter an order enjoining Defendants from engaging in any further gender or

religious discrimination against Morley in the workplace.

F.  Award Plaintiff damages for the discriminatory practices engaged  in violation

of the equal protection clause of the U.S. Constitution, the First Amendment to

the US Constitution,  and Vermont Fair Employment Practices Act.

G.  Award attorney's fees in favor of Plaintiff and against Defendants upon Plaintiff

prevailing in this litigation pursuant to 42 U.S.C. §1988

H.  Award costs in favor of Plaintiff and against Defendants upon Plaintiff

prevailing in this litigation.

I.  Grant Plaintiff such other and further relief which to this Honorable Court seems

just and equitable.

**PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES SO  TRIABLE.**

Dated at Walden,  Vermont this 7 day of November, 2021

**BENJAMIN MORLEY**

By:

Deborah T. Bucknam, Esq.
Bucknam Law, PC
434 Eastman Road
Walden, Vermont 05836
802-748-5525
dbucknam@vtlegalhelp.com

I swear, under penalty of perjury, that the facts outlined in this complaint, including the
exhibits attached hereto, are true.

Date 11/7/21

Benjamin Morley

Subscribed and sworn this date,

Notary Public