UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| BENJAMIN MORLEY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF VERMONT; | ) | |
| GOVERNOR'S WORKFORCE AND EQUITY | ) | |
| AND DIVERSITY COUNCIL; | ) | Case No. 5:21-cv-272 |
| VERMONT DEPT. OF HUMAN RESOURCES; | ) | |
| VERMONT DEPT. OF AGING AND | ) | |
| INDEPENDENT LIVING; VERMONT | ) | |
| DIVISION OF VOCATIONAL | ) | |
| REHABILITATION; | ) | |
| ALLISON LAND, in her individual and official | ) | |
| capacity; | ) | |
| HIBBARD DOE, in his individual capacity; | ) | |
| ELIZABETH HARRINGTON, in her individual | ) | |
| and official capacity; | ) | |
| DIANE DALMASSE, in her individual and | ) | |
| official capacity; | ) | |
| KAREN BLAKE-ORNE, in her individual and | ) | |
| official capacity; and | ) | |
| HEATHER BATALION, in her individual and | ) | |
| official capacity; | ) | |
| Defendants. | ) | |

**DEFENDANTS' COMBINED MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
AND INCORPORATED MEMORANDUM OF LAW**

The State of Vermont, Governor's Workforce Equity and Diversity Council, Department

of Human Resources, Department of Disabilities, Aging and Independent Living, Division of

Vocational Rehabilitation, and Allison Land, Elizabeth Harrington, Diane Dalmasse, Karen

Blake-Orne, and Heather Batalion in their official capacities[1] move pursuant to Federal Rules of

---

[1] Plaintiff's claims against the individual Defendants in their personal capacities are not addressed here, including Plaintiff's claim against Hibbard Doe, which the complaint indicates is solely an individual capacity claim.  The individual capacity claims are not relevant to the preliminary injunction motion, which seeks injunctive relief, and the individual Defendants anticipate responding to the personal capacity claims in February, consistent with the

Civil Procedure 12(b)(1) and 12(b)(6) to dismiss all claims against them. Defendants also oppose Plaintiff's Motion for Preliminary Injunction. In support, Defendants submit the following incorporated Memorandum of Law and the Declarations of Hibbard Doe, James Smith, and Karen Blake-Orne.[2]

<u>**MEMORANDUM OF LAW**</u>

**BACKGROUND**

**A.  Motion to Dismiss Factual Background**

Plaintiff's Complaint alleges the following. He has worked for the State of Vermont Division of Vocational Rehabilitation (DVR) in the Newport office as an associate adult counselor since November 2019. Complaint ¶¶ 13, 27, 35. DVR "help[s] Vermonters with disabilities prepare for, obtain, and maintain meaningful careers" and "employers recruit, retain and promote employees with disabilities." *Id*. ¶ 29. A VR counselor's job is "a collaborative effort between consumer and counselor to understand and adjust to disability, identify employment goals, and engage the resources needed to obtain and maintain stable employment." *Id*. ¶ 28.

Plaintiff claims he "was and is the only male VR counselor at DVR in Newport." *Id*. ¶ 35. He alleges a variety of slights throughout his employment at DVR, which he variously attributes to being white, a man, and being opposed to diversity training. For instance, he alleges that throughout his time at DVR, female colleagues have "harass[ed]" him with comments about "toxic masculinity" and "mansplaining." *Id*. ¶ 39. He has difficulty communicating with his female supervisor, Liz Harrington. *See id*. ¶¶ 43-45. He alleges that Ms. Harrington, who became

---

service waivers they returned.  To the extent Plaintiff intends to also assert an official capacity claim against Doe, it fails for the same reasons as Plaintiff's other official capacity claims.
[2] Consistent with Local Rule 7(a)(4), which sets a limit of 25 pages for a memorandum supporting a dispositive motion, and 15 pages for a memorandum opposing a non-dispositive motion, this filing, which combines both, is less than 40 pages in length.

his regional manager in the spring of 2021, and Karen Blake-Orne, who became his senior counselor and immediate supervisor around the same time, have "commented on particular consumers whom they said should not have a male counselor," and so did not assign him those consumers. *Id*. ¶ 51; *see also id*. ¶¶ 22, 142. He has "complained that he was assigned consumers who had been difficult in the past, even though he was relatively new at the job, and had less experience in DVR counseling than the female counselors." *Id*. ¶ 54.

In the spring of 2021, DVR held three mandatory employee trainings on diversity, equity, and inclusion conducted by a contractor named Mirna Valerio. *Id*. ¶¶ 58-62. In those trainings, Ms. Valerio discussed, among other things, how "race . . . play[s] a huge part in systemic, institutional, individual, interpersonal advantage and disadvantage," and how to "have empathy, awareness of the impact of current and historical examples of racism and other isms and then develop[] an action plan for yourself." *Id*. ¶¶ 84, 90. She encouraged participants to be "anti-racist" and pursue "social justice." *Id*. ¶ 109. She encouraged them to read materials that Plaintiff characterizes as "politically progressive." *Id*. ¶ 122. During the trainings, she "repeatedly encouraged participants to 'check in' with their emotions" and expressed her appreciation for their willingness to be uncomfortable. *Id*. ¶ 75. Plaintiff disagreed with the training's content and felt it "was not related to Vermont, nor to DVR's mission, nor VR counselors' job description." *Id*. ¶ 94.

Plaintiff stated during the training that "he did not agree with the concept of white privilege, and that he did not believe the United States today was systemically racist." *Id*. ¶ 134. He "expressed to other colleagues at VR that he did not agree with the training and felt that the trainings did not allow diversity of opinion, and discriminated against white men and women,

and minority groups." *Id*. ¶ 135. He also told HR that "he was concerned" about the use of language like "'white privilege.'" *Id*. ¶ 136.

Plaintiff alleges that his "colleagues reacted negatively" to his statements. *Id*. ¶ 137. He received supervisory feedback asking him to "use better judgment and to refrain from commentary and statements during work that do not foster a safe and inclusive work environment" after allegedly saying a colleague was "'brainwashed' concerning the 'social justice training.'" *Id*. ¶ 142. His supervisors started transferring his consumers to other counselors without his consent, which does not happen to other counselors. *Id*. ¶ 147.

On July 26, 2021, he published critiques of the trainings on two online news outlets, *id*. ¶ 149, and alleges this led to further slights: being questioned about his practice of placing reminders on his work calendar to stretch, receiving a reprimand for revealing confidential client information, not being assigned certain female consumers, and receiving supervisory feedback about failing to start a master's program that he is required to finish by November 1, 2024, *id*. ¶¶ 151-55.

On July 8, 2021, the Department of Disabilities, Aging and Independent Living "filed a Request for Proposals ('RFP') for a Diversity Equity and Inclusion Implementation Consultant for DVR," which Plaintiff refers to as an "equity audit." *Id*. ¶ 158. He imagines the Diversity Equity and Inclusion Implementation Consultant will "force [him] and other employees to confess their feelings about race, and to pledge to work towards 'anti-racism' activism if they want to keep their jobs." *Id*. ¶ 167. The start date for the contract was October 28, 2021. *Id*. ¶ 169.

**B.  Preliminary Injunction Motion Factual Background**

Plaintiff seeks to enjoin the State and various state employees from working with a Diversity

Equity and Inclusion Implementation Consultant, who he posits will engage in "thought control."

Mot. 14.

At present, DVR has issued an RFP for a Diversity, Equity and Inclusion Implementation

Consultant. Complaint Ex. 6. The request sought proposals for a diversity, equity and inclusion

implementation consultant. Declaration of James Smith, ¶ 4. DVR's Deputy Director James

Smith was the sole contact listed on the request. *Id*. ¶ 3. The request was prompted in part by a

needs assessment conducted by DVR, which showed high levels of overall satisfaction with

DVR's services that were somewhat lower for a small, but statistically significant, number of

Vermonters who identified as Hispanic. *Id*.

The RFP describes how DVR's mission is to help Vermonters with disabilities attain high-

quality jobs and pursue educational opportunities. Complaint, Ex. 6 at 3. It notes "that systemic

racism compounds the issues already faced by people with disabilities who are from racially or

ethnically marginalized groups." *Id*. at 4. Between 2016 and 2019, the percentage of DVR's

clients who identified as racial minorities rose from 5% to 8%. *Id*. at 3. The RFP therefore states

that, as Vermont becomes more diverse, DVR increasingly needs to train its staff "around racial

justice and cultural competency" to better serve that increasingly diverse population. *Id*. at 4.

DVR is currently in the process of negotiating a contract to take the steps listed in the RFP.

Smith Decl., ¶ 5. The contract has not yet been finalized, but it contemplates an initial needs

assessment phase lasting about 6 months, and generating the information needed for stakeholders

to meaningfully inform the future of DVR's strategy. *Id*. ¶ 6. DVR would then review the needs

assessment and decide whether to approve, reject, or modify it. Complaint, Ex. 6 at 6. If DVR

approves the needs assessment, the contractor "must develop a plan in close consultation with

DVR" that is "tailored to the unique needs of DVR" and "based on the findings from the needs

assessment." *Id.* The second, data evaluation and planning phase of the contract is expected to

last another 6 months. Smith Decl., ¶ 6. DVR will then review "[t]he project plan" and decide

whether to approve, reject, or modify it. Complaint, Ex. 6 at 6. If DVR approves the plan, the

"contractor will provide training and consultation for DVR in support of implementation of the

plan" on an as-needed basis, and if each of the previous steps is approved and completed, the

"contractor will develop systems and strategies to sustain DEI as part of DVR's ongoing work."

*Id.*

## ARGUMENT

### I.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face" by pleading

"factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 678 (2009) (quotations omitted). "A

pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of

action will not do." *Id*. (quotations and alterations omitted).

To survive a Rule 12(b)(1) motion to dismiss, a complaint must "allege[] facts that

affirmatively and plausibly suggest . . . standing to sue." *Carter v. HealthPort Techs., LLC*, 822

F.3d 47, 56 (2d Cir. 2016) (quotation omitted). It is Plaintiff's burden to prove subject-matter

jurisdiction, and "that showing is not made by drawing from the pleadings inferences favorable

to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 U.S. 167, 170 (2d Cir. 2008)

(quotation omitted), *aff'd*, 561 U.S. 247 (2010). The court "need not 'credit a complaint's

conclusory statements without reference to its factual context,'" so "where a conclusory

6

allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009)).

## II.    Sovereign immunity bars Plaintiff's claims against the State, its arms and instrumentalities, and all Defendants in their official capacities.

Sovereign immunity is a jurisdictional bar. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). It bars claims against unconsenting states and "arms of the state, such as state agencies." *Walker v. City of Waterbury*, 253 F. App'x 58, 60 (2d Cir. 2007) (quotation and citation omitted). It also generally bars claims against state officials sued in their official capacities because "[a]n action against a state official in his official capacity is deemed an action against the state itself." *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020) (citations omitted). The exception to this rule, enunciated in *Ex parte Young*, 209 U.S. 123 (1908), is that "suits for prospective relief against an individual acting in his official capacity may be brought to end an ongoing violation of a federal law." *Vega v. Semple*, 963 F.3d 259, 282 (2d Cir. 2020). *Ex parte Young* does not apply to retrospective claims, such as claims for damages, against the State and its officers in their official capacities, so they are barred by sovereign immunity. *Green v. Mansour*, 474 U.S. 64, 68 (1985).[3]

As an initial matter, to the extent Plaintiff intends to bring his Vermont Fair Employment Practices Act claim against the State, its arms, and the individual Defendants in their official capacity, sovereign immunity bars such a claim that the State violated State law. *See Vega*, 963

---

[3] Therefore, to the extent Plaintiff is requesting money damages against the State, its arms and instrumentalities, or its officers in their official capacities, sovereign immunity bars those claims. *See Green*, 474 U.S. at 73 (reciting that in § 1983 action, "award of damages or restitution by the federal court" is "of course prohibited by the Eleventh Amendment"); *Libertarian Party of Erie Cty.*, 970 F.3d at 123 (a "state official sued in his official capacity is entitled to invoke Eleventh Amendment immunity from a claim for damages").

F.3d at 284.  *Ex parte Young* does not apply to claims premised on violations of state law.

Rather, a "claim that state officials violated state law in carrying out their official responsibilities

is a claim against the State that is protected by the Eleventh Amendment." *Id.* at 284 (quoting

*Pennhurst*, 465 U.S. at 121).

All of Plaintiff's claims against the State, Governor's Workforce Equity and Diversity

Council, Department of Human Resources, Department of Disabilities, Aging and Independent

Living, and Division of Vocational Rehabilitation are also barred by sovereign immunity.

Departments and divisions of the State executive branch are axiomatic arms of the State. *See*

*Monreal v. New York*, 518 F. App'x 11, 12 (2d Cir. 2013) (state departments of health and

education arms of the state entitled to sovereign immunity); *Richardson v. Vermont*, No. 1:15-

CV-120, 2015 WL 9921313, at *4, 4 n.1 (D. Vt. Dec. 23, 2015), *adopted*, No.

115CV00120JGMJMC, 2016 WL 347328 (D. Vt. Jan. 28, 2016) (dismissing claims against State

and Department of Corrections, as arm of the state, on sovereign immunity grounds).

The Governor's Workforce Equity and Diversity Council is also an arm of the State. The

Second Circuit makes this determination via a two-part test. First, the court evaluates the

"*Feeney* factors":

> (1) how the entity is referred to in the documents that created it;
> (2) how the governing members of the entity are appointed;
> (3) how the entity is funded;
> (4) whether the entity's function is traditionally one of local or state government;
> (5) whether the state has a veto power over the entity's actions; and
> (6) whether the entity's obligations are binding upon the state.

*Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 293 (2d Cir. 1996) (citing *Feeney v. Port*

*Auth. Trans–Hudson Corp.*, 873 F.2d 628, 630–31 (2d Cir. 1989)). If those factors weigh in

favor of finding the entity is "more like an arm of the State, such as a state agency, than like a

municipal corporation or other political subdivision," the inquiry is complete. *Mercy Flight*

*Cent., Inc. v. N.Y. Div. of State Police*, No. 07-CV-6322 (CJS), 2008 WL 4282624, at *6 (W.D.N.Y. Sept. 16, 2008) (quotation omitted).

If the factors are inconclusive, the court asks if allowing the entity to be sued in federal court could "threaten the integrity of the state" and "expose the state treasury to risk." *Mancuso*, 86 F.3d at 293 (citing *Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30 (1994)). The *Feeney* factors conclusively show the Council is an arm of the State; no factor suggests it is more like a municipal corporation. First, its current iteration was created by Executive Order No. 3-59 (Dec. 31, 2013).[4] It is, per that creating document, "attached to the Department of Human Resources," tying it to the State administration. Second, its members are nearly all ex officio State employees or appointees of the Governor (an exception is that one member is to be from the Vermont State Employees' Association), and all members "serv[e] at the pleasure of the Governor." Executive Order No. 3-59. Third, it can receive State funds; "[t]o the extent funds permit, members of the Council who are not state employees shall receive a per diem pursuant to 32 V.S.A. § 1010(e)," and it receives administrative support from the Department of Human Resources. *Id*. Fourth, its function—helping develop and implement human resources services for the State administrative branch—is a traditional State, not local, government function. *See id*. Fifth, the Governor has effective veto power over its actions because its members serve at the Governor's pleasure. *See id*. The *Feeney* factors therefore show the Council is an arm of the State and entitled to sovereign immunity.

Next, all of the individual defendants against whom Plaintiff asserts official capacity claims – Harrington, Blake-Orne, Land, Dalmasse, and Batalion – are entitled to sovereign immunity in their official capacities because Plaintiff has not plausibly alleged that they are engaged in an

---

[4] https://legislature.vermont.gov/statutes/section/03APPENDIX/003/00059

ongoing violation of federal law, so the *Ex parte Young* exception does not apply. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (to determine whether *Ex parte Young* applies, "court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" (quotation omitted)).  It is Plaintiff's burden to establish it applies. *See Knight v. N.Y. State Dep't of Corrs.*, No. 18-CV-7172 (KMK), 2020 WL 3893282, at *8, 9 n.7 (S.D.N.Y. July 10, 2020) (holding "plaintiff must establish the applicability of *Ex parte Young*" and failed to do so where "alleged constitutional violations occurred in the past," as "past wrongs do not justify an application of *Ex parte Young*" (quotation and alteration omitted)).  Vague and speculative allegations of ongoing harm are insufficient to establish *Ex parte Young* applies. *Boise Artesian Hot & Cold Water Co. v. Boise City*, 213 U.S. 276, 285 (1909) ("vague allegation" insufficient); *KM Enters., Inc. v. McDonald*, No. 11-CV-5098 ADS ETB, 2012 WL 4472010, at *10 (E.D.N.Y. Sept. 25, 2012), *aff'd*, 518 F. App'x 12 (2d Cir. 2013) (vague and speculative allegations insufficient to establish *Ex parte Young* applies); *Aho v. Anthony*, No. 3:09-CV-728 (CFD), 2009 WL 10711875, at *2 (D. Conn. Dec. 4, 2009) (where plaintiff claimed state troopers violated his rights by ejecting him from town meeting and might "be present at another meeting and prevent [him] from voting," claim was "too speculative to invoke the *Ex Parte Young* doctrine").

Harrington is immune from suit in her official capacity because Plaintiff's allegations regarding her consist entirely of past perceived slights. Complaint ¶¶ 21, 41-45, 47, 49, 51, 142, 148, 151, 153-54, 157. Plaintiff does not allege, much less plausibly allege, that she is engaged in an ongoing violation of federal law. *See Falcon v. City Univ. of N.Y.*, No. 15CV3421ADSARL, 2016 WL 3920223, at *9 (E.D.N.Y. July 15, 2016) (holding alleged past "acts of discrimination

are not the kind of ongoing violations of federal law that . . . *Ex parte Young* was intended to remedy").

Blake-Orne is likewise immune from suit in her official capacity because the allegations regarding her also consist entirely of past perceived slights. Complaint ¶¶ 41, 51, 139-42, 152, 155.  Plaintiff does not allege she is engaged in an ongoing violation of federal law.

Land is immune from suit in her official capacity. Plaintiff alleges she "was and is the Human Resources Administrator at HR and was and is responsible for implementing the DEI program at DVR," *id*. ¶ 19, and she "was personally involved in implementing the DEI program for DVR," *id*. ¶ 57. He does not specify how, if at all, he imagines she might violate his rights in the future. Such vague allegations do not suffice to establish an ongoing violation of federal law. *KM Enters*., 2012 WL 4472010, at *10. He also describes two innocuous-seeming past interactions with her: he "shared" his concerns about the training with her. *Id*. ¶ 136. He "wrote to" her about supervisory feedback he received and she replied that the feedback "was not discipline." *Id*. ¶¶ 145-46. There is no allegation—much less a plausible allegation—that she is engaged in an ongoing violation of federal law.

Dalmasse is immune from suit in her official capacity. Plaintiff alleges "Dalmasse was and is DVR Director, and has had supervisory authority over Morley, Doe, Harrington, and Blake-Orne. Dalmasse also is instrumental in implementing the DEI training and the proposed equity audit." *Id*. ¶ 23. He alleges she "frequently speaks of her pride in DVR's DEI program, and expresses the need to continue 'the work.'" *Id*. ¶ 23. To the extent this is meant to suggest she is engaged in some ongoing violation of federal law, such vague and conclusory allegations do not suffice. *KM Enters*., 2012 WL 4472010, at *10. And to the extent Plaintiff is suggesting she is liable under a theory of respondeat superior, this theory fails, as "vicarious liability is

inapplicable to *Bivens* and § 1983 suits," so "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff's only other allegation regarding her is that she negotiated Mirna Valerio's contract. Complaint ¶ 23. If he is suggesting this violated his rights, it is purely retrospective and thus inapplicable. *Verizon Md., Inc.*, 535 U.S. at 645.

Finally, Batalion is immune from suit in her official capacity. Plaintiff alleges "Batalion is Vocational Rehabilitation Training Coordinator, and was instrumental in organizing the required DEI trainings, and is involved, upon information and belief, in the proposed equity audit. Batalion was also involved in the formation of the DAIL equity task force and equity committee." Complaint ¶ 24. Such vague and conclusory allegations do not suffice. *KM Enters*., 2012 WL 4472010, at *10. He also alleges she negotiated Valerio's contract, *id*. ¶ 58, and set up, organized, and monitored the trainings, *id*. ¶ 64. Even if he is suggesting this violated his rights, it is retrospective and does not show an ongoing violation. *Verizon Md., Inc.*, 535 U.S. at 645.

III.    **Plaintiff's Free Exercise, Privacy, Establishment Clause, Article VI, and Hatch Act claims fail and should be dismissed.**

a.    **Plaintiff lacks standing to bring a Free Exercise claim.**

Plaintiff lacks standing to bring a Free Exercise claim because he does not allege that the government has burdened or interfered with any religious belief or practice of his. "To have standing to pursue a claimed violation of the Free Exercise Clause, a plaintiff must allege that her own particular religious freedoms are infringed." *Altman v. Bedford Cent. Sch. Dist*, 245 F.3d 49, 71 (2d Cir. 2001) (quotation omitted); *see also Harris v. McRae*, 448 U.S. 297, 320 (1980) (holding plaintiffs "lack standing to challenge the Hyde Amendment on free exercise grounds because none alleged, much less proved, that she sought an abortion under compulsion of religious belief"); *McGowan v. Maryland*, 366 U.S. 420, 429 (1961) (holding parties lacked

standing to bring Free Exercise claim where they "do not allege any infringement of their own religious freedoms"); *Valente v. French,* No. 2:20-CV-00135, 2021 WL 3620073, at *13 (D. Vt. Aug. 16, 2021) (dismissing Free Exercise claim where plaintiffs failed to "assert sufficient allegations necessary to establish that [their] claim is based upon a sincerely held religious belief"). Where "the Complaint fails to identify plaintiff's religion or explain the role of" the conduct at issue "in her religion, it fails to set forth facts demonstrating that the disputed conduct infringed upon a sincerely held religious belief." *Meadows v. Lesh*, No. 10-CV-00223 M, 2010 WL 3730105, at *3 (W.D.N.Y. Sept. 17, 2010); *see also Jackson v. Boucaud*, No. 9:08-CV-1373, 2009 WL 6066799, at *6 (N.D.N.Y. Dec. 31, 2009), *adopted*, 2010 WL 933744 (N.D.N.Y. Mar. 15, 2010) (dismissing Free Exercise claim where "complaint allege[d] in conclusory fashion that defendants denied [plaintiff] religious freedom when refusing to permit access to the material at issue . . . without any further clarification of what his religion is, or what sincerely-held beliefs are attached to its practice").

Nowhere in the Complaint does Plaintiff allege that he is religious, much less explain how any conduct by any Defendant infringes upon a sincerely held religious belief of his. *See generally* Complaint. The "sincerely held beliefs" on which he predicates his Free Exercise claim are entirely secular: "that all persons are created equal, with certain inalienable rights; that we are all individuals, not part of a collective, that we all must be color blind when judging a person's character, that hard work, a strong family and honesty, not the color of one's skin, will result in a successful and happy life" and "that all lives matter." Complaint ¶ 202. Having failed to "allege any infringement of [his] own religious freedoms," *McGowan*, 366 U.S. at 429, Plaintiff has not even begun to establish that he has standing to bring a claim under the Free Exercise Clause.

### b.  Plaintiff's claim for violation of the right to privacy fails.

The Supreme Court has assumed without deciding that "there is a constitutional right to informational privacy." *Nat'l Aeronautics and Space Admin. v. Nelson*, 562 U.S. 134, 148 n.10 (2011).  It specifically assumed in *NASA* "that a job-related background investigation could implicate a government employee's constitutional privacy rights" but "recognized that the government was entitled to conduct 'reasonable, employment related inquiries'" of its employees.  *Hubacz v. Protzman*, No. 2:12–cv–39, 2013 WL 1386287, *8 (D. Vt. April 4, 2013) (quoting *NASA*, 562 U.S. at 759).  To state a claim challenging executive action on the theory that it infringes a protected privacy right, a plaintiff "must show not just that the action was literally arbitrary, but that it was arbitrary in the constitutional sense." *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (quotations omitted).

Alleged negligence or irrationality "is not enough." *Id.* Rather, "'only the most egregious official conduct'" that "'shock[s] the conscience'" will suffice.  *Hancock v. Cty of Rensselaer*, 882 F.3d 58, 66 (2d Cir. 2018) (quoting *O'Connor*, 426 F.3d at 203).  "'[W]hether executive action shocks the conscience depends on the state of mind of the government actor and the context in which the action was taken.'" *Id.*

Plaintiff's privacy claim rests on the theory that he was asked improper questions during the training he allegedly found upsetting.  Complaint ¶¶ 197–199.  But he does not allege that any of the Defendants asked him any questions during the training.  Complaint ¶¶ 70–79; 197-99.  And contracting with an experienced trainer to conduct diversity, equity, and inclusion training is not "'egregious official conduct'" that "'shock[s] the conscience.'" *Hancock*, 882 F.3d at 66 (quoting *O'Connor*, 426 F.3d at 203).  To the contrary, it is a good thing for many reasons.

The Division of Vocational Rehabilitation of the Department of Disabilities, Aging, and Independent Living is a public facing agency that serves a diverse population of often vulnerable Vermonters.  It should foster an inclusive work environment.  And employers that do foster an inclusive work environment can realize performance, workforce loyalty, and legal benefits.[5]  The Second Circuit has also repeatedly recognized that how the public perceives public facing agencies has a significant effect on how effectively they can pursue their mission.  *See Locurto v. Giuliani*, 447 F.3d 159, 178–80 (2d Cir. 2006) (collecting cases acknowledging that the effectiveness of public facing agencies "depends importantly on the respect and trust of the community" and that perceptions of minority bias can impede the work of agencies and damage their ability "to recruit and train personnel").

Plaintiff's claim also fails because Plaintiff mischaracterizes the training itself.  Plaintiff alleges that during "DEI trainings, Plaintiff and other employees at DVR were intentionally pressured by Valerio to reveal intimate details of their private lives, and their personal emotional feelings" and purports to support this assertion by repeatedly quoting Exhibit 3 to the complaint.  Complaint ¶¶ 197, 70-84.  Exhibit 3 is a partial transcript of portions of the training, which the Court can consider because Plaintiff attached it to the complaint and quotes it repeatedly.  *See,*

---

[5] Research showing performance and workforce loyalty benefits includes: Sundiatu Dixon–Fyle, et al, Diversity Wins, McKinsey & Co. (2020), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters; Marcus Noland, et al., Is Gender Diversity Profitable? Evidence from a Global Survey, Peterson Institute for International Economics, Working Paper 16-3 (2016); Rocio Lorenzo, et al., How Diverse Leadership Teams Boost Innovation, Boston Consulting Group (2018), https://www.bcg.com/publications/2018/how-diverse-leadership-teams-boost-innovation; and The Deloitte Millennial Survey 2018, https://www2.deloitte.com/tr/en/pages/about-deloitte/articles/millennialsurvey-2018.html.  By fostering an inclusive environment, employers can avoid discrimination and hostile work environment claims.  And employers that "exercise[] reasonable care to prevent and correct promptly" sexually harassing behavior can raise that care as an affirmative defense in some situations.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

*e.g., Chambers*, 282 F.3d at 152 ("the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference").

A comparison of the transcript with Plaintiff's allegations confirms that they are meritless. Plaintiff first alleges that Ms. Valerio asked participants to share how they were feeling at the beginning of the session.  Complaint ¶¶ 70-71.  Defendants are aware of no case law suggesting that asking someone how they are feeling is improper, much less that it is "egregious official conduct" that "shocks the conscience."  *See O'Connor*, 426 F.3d at 203.  Plaintiff next asserts that "Valerio stated that she would not take questions."  Complaint ¶ 73.  But what she actually said was "I do not take real-time questions," for reasons she explained, and "If you do have questions, we have a lovely hour after lunch" during which questions could be raised and discussed. ECF No. 1–3 at 1.

And Ms. Valerio repeatedly framed her questions to employees in voluntary terms.  For example, Plaintiff alleges that "[n]ear the beginning of the first training session" she listed the phrases in paragraph 76.  Complaint ¶ 76.  She then encouraged employees to "take a minute and reflect" on how they felt after hearing the phrases, and then asked "[i]f you are willing, please share a couple of words in the chat."  ECF No. 1–3 at 3.  Similarly, when discussing how employees might identify themselves using cultural identifiers, she reiterated "you don't have to share what you don't want to share . . . Go with as many as you want; just kind of write it down; and then we are going to do some sharing."  *Id.* at 8.  She reiterated that her questions were voluntary at the beginning of the second training session, and apologized if anyone initially got the wrong impression and felt uncomfortable, stating:

> a note about last week's training and also about this week's training, if I call on you (laughs) never feel obligated to share, if you are feeling some discomfort; and so what I am going to do, if you want to share, if you are a person who doesn't mind getting called on; please put your name in the chat . . . I apologize if I made

> anybody feel uncomfortable and so we are going to do it that way; you can always
> when we do a group share, you can decline . . . or unmute yourself and start
> talking.

*Id.* at 15.

Plaintiff is correct that Ms. Valerio stated that she appreciated the willingness of employees "to perhaps be uncomfortable today; and to discuss some potentially difficult things." Complaint ¶ 72. But encouraging people to be willing to discuss potentially difficult issues, while confirming that they can decline to speak if they are feeling uncomfortable, is a strategy for healthy growth, not shocking official misconduct.

Finally, Plaintiff's privacy claim would fail even if Plaintiff had identified actual problems with the training. As discussed above, contracting for diversity, equity, and inclusion training is not misconduct. And Plaintiff makes no allegations that could support a claim that any Defendant acted negligently or irrationally when requesting proposals from potential trainers, much less that the selection process involved "egregious official conduct" that "shock[s] the conscience." *Hancock*, 882 F.3d at 66.

### c. Plaintiff's Establishment Clause claim fails.

Plaintiff's Establishment Clause claim fails because diversity training is not a religion. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend I. Government conduct does not violate the Establishment Clause if it (1) has "a secular legislative purpose," (2) has a "principal or primary effect . . . that neither advances nor inhibits religion," and (3) does "not foster an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).

Plaintiff has not plausibly alleged that the diversity trainings' "actual purpose is to endorse or disapprove of religion," as the first *Lemon* prong requires. *Altman*, 245 F.3d at 75. "To be sure,

the governing case law does not precisely define the contours of what constitutes 'religion.' But that does not mean there are no easy cases. To the contrary, courts are well-equipped to weed out spurious Establishment Clause 'religions' on grounds of common sense." *Sevier v. Lowenthal*, 302 F. Supp. 3d 312, 320–21 (D.D.C. 2018) (citation omitted) (rejecting claim that acceptance of homosexuality is a religion because "[i]f the mere acceptance of homosexuality—or support for gay rights—constitutes a 'religion' for Establishment Clause purposes, then the same conclusion would presumably follow for any value judgment about how people should or should not live their lives"); *see also Altman*, 245 F.3d at 76 (rejecting argument that Earth Day violated Establishment Clause); *Daniel Chapter One v. F.T.C.*, 405 F. App'x 505, 506 (D.C. Cir. 2010) (rejecting claim that "scientism" is a religion); *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 520–21 (9th Cir. 1994) (rejecting "evolutionism," the view that "higher life forms evolved from lower ones"); *United States v. Allen*, 760 F.2d 447, 449–51 (2d Cir. 1985) (rejecting "nuclearism," the view that nuclear weapons are "sacred objects").

The Second Circuit has "adopt[ed] for establishment clause purposes the conventional, majority view, rather than [the plaintiff's] view, of what is religious and what is political." *Allen*, 760 F.2d at 450. As a document attached to—and so deemed included in—the Complaint reflects,[6] DVR is engaging in Diversity, Equity, and Inclusion efforts because "the demographics of Vermont are changing, and the population is becoming more ethnically and racially diverse," highlighting "the need for DVR staff training around racial justice and cultural competency," particularly because "systemic racism compounds the issues already faced by people with disabilities who are from racially or ethnically marginalized groups." ECF No. 1-6 at 4. DVR's

---

[6] For purposes of Rule 12(b)(6), "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quotation omitted).

purpose concerns sociological and philosophical issues, not religious belief. *See United States v. Seeger*, 380 U.S. 163, 165 (1965) (distinguishing religious beliefs from "political, sociological, or philosophical views").

Plaintiff claims that DVR's diversity trainings were "indoctrination" in the religious "dogma" of Diversity, Equity, and Inclusion. Complaint ¶ 3. He claims that the diversity trainings bore the "hallmarks of religious indoctrination" because they had "no empirical evidence," were "couched . . . in terms of absolute truths," exhorted participants to feel guilt and shame, urged participants to action, said anti-racism work would take a lifetime, and taught "that racism is pervasive, and omnipresent, and reaches . . . every aspect of every American's life." Complaint ¶¶ 206-11. Even if Plaintiff was correct that there is no empirical evidence for systemic racism, so anti-racism diversity training resembled religion, that would not make diversity training a religion. "The fact that religions involve acceptance of some tenets on faith without scientific proof obviously does not mean that all beliefs and all theories which rest in whole or in part on faith are therefore elements of a religion as that term is used in the [F]irst [A]mendment." *Crowley v. Smithsonian Inst.*, 636 F.2d 738, 742 (D.C. Cir. 1980). If individuals could challenge state action on the grounds that the action somehow resembles religion, any government action could be subject to challenge. *Alvarado v. City of San Jose*, 94 F.3d 1223, 1230 (9th Cir. 1996) ("[I]f anything can be religion, then anything the government does can be construed as favoring one religion over another, and the government is paralyzed." (quotation and alteration omitted)). "The Establishment Clause's meaning is not so capacious." *Sevier*, 302 F. Supp. 3d at 321-22.

For the same reason—that diversity training is not a religion—Plaintiff's claim likewise founders on the second *Lemon* prong: that a reasonable observer would believe that diversity

training endorses religion. This prong is objective, and courts assume the "hypothetical observer [is] informed as well as reasonable." *Alvarado*, 94 F.3d at 1232. A reasonable observer would no more think that diversity training is a religion than that support of gay rights, Earth Day celebrations, teaching evolution, or use of nuclear weapons are. *See Sevier*, 302 F. Supp. 3d at 320–21; *Altman*, 245 F.3d at 76; *Peloza*, 37 F.3d at 520–21; *Allen*, 760 F.2d at 449-51.

Plaintiffs' claim also fails the final *Lemon* prong, excessive government entanglement with religion, for the same reason—that diversity training is not a religion. Indeed, this Court recently rejected an analogous argument that the State's mask requirement and encouragement of hand washing and social distancing were "based on a belief system without scientific backing" and "resemble cult-like practices," and so resulted in excessive entanglement between religion and state. Order Dismissing Complaint, *Hogue v. Scott*, Case 2:20-cv-00218-wks, ECF No. 21 at 20 (D. Vt. May 21, 2021). This Court held that the plaintiffs had failed to plausibly allege facts showing excessive government entanglement with religion. *Id*. In other words, as this Court has already recognized, calling a secular government practice religious does not make it so.

### d.  Plaintiff's Article VI claim fails.

Plaintiff cannot state an Article VI claim because he alleges no religious test for an office or trust of the United States. Article VI, clause 3 of the U.S. Constitution, or the No Religious Test Clause, states in pertinent part that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." The Clause is not susceptible to "secret or technical meanings." *Am. Atheists, Inc. v. Shulman*, 21 F. Supp. 3d 856, 870 (E.D. Ky. 2014). It just means what it says: offices or trusts of the United States cannot be conditioned on religious tests. *See Torcaso v. Watkins*, 367 U.S. 488, 491 (1961) (noting, in case decided on First Amendment grounds, that Clause was included in Constitution out of "desire to put the people

securely beyond the reach of religious test oaths"). As Plaintiff has not alleged he has been subjected to a religious test, his claim fails. *See generally* Complaint.

The claim further fails as Plaintiff alleges no test for an office or trust of the United States. "[T]he only reason for extending the Clause to the States would be to protect Senators and Representatives from state-imposed religious qualifications," as there is "no one else who holds a 'public Trust under the United States' yet who might be subject to state disqualifications." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 903 (1995) (Thomas, J., dissenting). As Plaintiff does not allege that he holds or sought an office or trust of the United States, his claim fails.

### e.  Plaintiff's Hatch Act claim fails.

Plaintiff's Hatch Act claim fails because the Hatch Act does not create a private cause of action.  *See Komatsu v. City of New York*, No. 20–cv–7046, 2021 WL 3038498, *14 (S.D.N.Y. July 16, 2021) ("The government has exclusive enforcement authority over Hatch Act violations; thus there is no private right of action . . . to enforce it."); *Hall v. Clinton*, 285, F.3d 74, 83 (D.C. Cir. 2002) (alleged violations of the Hatch Act are not "privately actionable").  It also fails because Plaintiff does not allege that the trainer here was a state employee, which the Hatch Act defines as "an individual employed by a State or local agency."  *See* 5 U.S.C. § 1501(4).

### IV.    Plaintiff's request for a preliminary injunction should be denied.

"A party seeking a preliminary injunction must establish 1) a likelihood of success on the merits, 2) a likelihood of irreparable harm absent relief, 3) that the balance of equities was in its favor, and 4) that an injunction is in the public interest." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n.2 (2d Cir. 2019). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear

showing, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Moreover, "[w]hen a plaintiff seeks to enjoin the activity of a government agency, . . . his case

must contend with the well-established rule that the Government has traditionally been granted

the widest latitude in the dispatch of its own internal affairs." *Rizzo v. Goode*, 423 U.S. 362,

378–79 (1976) (quotation omitted). In deciding a motion for a preliminary injunction, the court

need not accept the allegations in the complaint as true. *See Cacchillo v. Insmed, Inc*., 638 F.3d

401, 404 (2d Cir. 2011). The court instead considers the "entire record including affidavits and

other hearsay evidence." *Park Irmat Drug Corp. v. Optumrx, Inc*., 152 F. Supp. 3d 127, 132

(S.D.N.Y. 2016) (quotation omitted).

### a.  Plaintiff cannot show a likelihood of irreparable harm absent relief.

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of

a preliminary injunction.'" *Faively Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d

Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)).  Accordingly, a

party seeking a preliminary injunction must demonstrate that irreparable harm "would be 'likely'

in the absence of a preliminary injunction 'before the other requirements for the issuance of [an]

injunction will be considered.'"  *JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 Fed. Appx. 31,

33 (2d Cir. 2015) (quoting *Rodriguez*, 175 F.3d at 234)).  To show irreparable harm, the "movant

must demonstrate an injury that is neither remote nor speculative, but actual and imminent and

that cannot be remedied by an award of monetary damages." *Rodriguez*, 175 F.3d at 234.

Plaintiff falls well short of carrying this burden because he seeks to challenge something that

is not imminent on a harm theory that is entirely speculative.  Perhaps in recognition of this

reality, Plaintiff did not file this action until November 15, 2021, more than four months after

DVR issued a request for proposals seeking to enter into a contract with a consultant to develop

and implement a diversity plan and almost 3 weeks after the initial target contract

commencement date.  Indeed, if Plaintiff was challenging something imminent on a

nonspeculative theory, this extended delay would require denial of the preliminary injunction

motion.

> **1. Plaintiff has failed to establish that he would be irreparably harmed by DVR entering into a multiyear contract, with a company unrelated to the trainer Plaintiff disliked, to gather information and make a long-term diversity plan.**

Plaintiff's irreparable harm theory fails as a matter of law.  First, Plaintiff seeks to challenge

something that is not "imminent" – the implementation of a diversity plan that: (1) has not been

developed yet, (2) will not be developed for approximately a year, and (3) will be based on a

needs assessment that has not yet been completed.  *Rodriguez*, 175 F.3d at 234.  Second,

Plaintiff's future injury theory is entirely speculative.  At this point, Plaintiff has disagreed with a

one-time training course by one contractor.  He cannot demonstrate "an injury that is neither

remote nor speculative" by theorizing that he will be harmed by a not-yet-written future plan

that: (1) will be prepared by a different, unrelated contractor and (2) will be tailored to be unique

to DVR based on a not-yet-completed needs assessment.  *Id.*

Plaintiff's motion begins by describing his disagreement with the contents of a training

delivered by Mirna Valerio in March and April 2021.  Mot. at 2-13.  It then observes that in July,

DVR issued a request for proposals seeking to enter into a contract with a diversity, equity, and

inclusion consultant.  Mot. at 5, 13-14; Ex. 6.  Finally, the motion quotes a portion of the training

Plaintiff disliked and suggests that the DVR's request for proposals was a solicitation for a

"thought control" "equity audit" by the trainer Plaintiff disagreed with.  Mot. at 14.  It was not.

The request sought proposals from unrelated companies to complete a thoughtful, multistage

process that will eventually result in a not-yet-written diversity, equity, and inclusion plan, and

the long-term implementation of that plan, so that DVR can better serve its clients.  Indeed, the request was prompted in part by a needs assessment conducted by DVR, which showed high levels of overall satisfaction with its services that were somewhat lower for a small, but statistically significant number of Vermonters who identified as Hispanic.  Declaration of James Smith, ¶ 4.  As a public facing agency whose mission is to serve all Vermonters, DVR can – and should – take steps to ensure that it works seamlessly with all of its clients.

DVR is currently in the process of negotiating a contract to take each of the steps listed in the request for proposals with Social Contract, LLC, a consulting firm based in Delaware.  Smith Decl., ¶ 5.  First, the "selected contractor will conduct a needs assessment of the DVR program and organization" to gather information relevant to "five broad areas."  Complaint, Ex. 6 at 5–6.  The contract has not yet been finalized, but it contemplates the initial needs assessment phase lasting roughly 6 months, and generating the information needed for stakeholders to meaningfully inform the future of DVR's strategy.  Smith Decl., ¶ 6. DVR will then review the needs assessment and decide whether to approve, reject, or modify it.  Complaint, Ex. 6 at 6.

Second, if DVR approves the needs assessment, the contractor "must develop a plan in close consultation with DVR" that is "tailored to the unique needs of DVR" and "based on the findings from the needs assessment."  *Id.* DVR will then review "[t]he project plan" to "incorporate DEI in all aspects" of DVR and decide whether to approve, reject, or modify it.  This planning stage is also expected to last roughly 6 months.  Smith Decl., ¶ 6.  Third, if DVR approves the plan, the "contractor will provide training and consultation for DVR in support of implementation of the plan" on an as-needed basis.  Finally, if each of the previous steps is approved and completed, the "contractor will develop systems and strategies to sustain DEI as part of DVR's ongoing work." *Id.*

In sum, Plaintiff's motion seeks to challenge something that is by no means imminent – the implementation in about a year of a plan that has not yet been created.  His motion fails because a party seeking preliminary relief "must show that the injury complained of is of such imminence that there is a clear and present need for relief to prevent irreparable harm."  *Phoenix Beverages, Inc. v. Exxon Mobil Corp.*, No. 12–cv–3771, 2015 WL 588826, *5 (E.D.N.Y. Feb. 11, 2015) (quoting *City of N.Y. v. Anglebrook Ltd. P'ship*, 891 F. Supp. 908, 925 (S.D.N.Y. 1995)).  It also fails because Plaintiff's assertion that he will be harmed at an unknown time in the future, in an unknown manner, by a not-yet-written plan, is pure speculation.  *Rodriguez*, 175 F.3d at 234.

### 2. Plaintiff's delay in bringing his motion would require its denial even if his irreparable harm theory was not entirely speculative.

Plaintiff's "claimed need for injunctive relief is" also "belied by" his "delay in seeking that relief."  *Garland v. New York City Fire Department*, No. 21–cv–6586, 2021 WL 5771687, *9 (E.D.N.Y. Dec. 6, 2021) (so finding after considering a much shorter 32-day delay).  "'Lack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief because it goes primarily to the issue of irreparable harm.'"  *Id.* at *9 (E.D.N.Y. Dec. 6, 2021) (quoting *Majorica,S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7, 8 (2d Cir. 1985)).  "'Indeed, in this Circuit, preliminary injunctions have been denied on account of even relatively short delays.'"  *Id.* (quoting *Alcon Vision, LLC v. Lens.com, Inc.*, No. 18–cv–407, 2020 WL 5899879, *9 (Feb. 28, 2020)).  An unreasonable delay in seeking a preliminary injunction "'may preclude a finding of irreparable harm because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief.'"  *Id.*

Here, the request for proposals was posted on July 8, 2021, with an indicated commencement of contract date of October 27, 2021.  Complaint, Ex. 6 at 1.  Plaintiff nevertheless did not file this action until November 15, 2021, more than four months after the request was posted and

almost 3 weeks after the indicated commencement date.  This delay independently requires denial of Plaintiff's motion.

> ### b.   Plaintiff cannot show a likelihood of success on the merits.

Plaintiff has also failed to show a likelihood of success on the merits as to any of his claims for purposes of challenging hypothetical future conduct by any Defendant.  As described above in Section II, Plaintiff has failed to plausibly allege any ongoing violations of law.  Rather, his claims rest entirely on his disagreement with a completed training and perceived past slights. And as described in Section IV.a., Plaintiff's attempted factual showing about what may happen in the future after DVR spends approximately a year working with an independent contractor to gather information and prepare a diversity, equity, and inclusion plan is entirely speculative. Plaintiff has also failed to show a likelihood of success on the merits as to his Establishment Clause, Free Exercise, and Hatch Act claims for the reasons described in Section III.

Put another way, Plaintiff's motion would fail even if everything he said about how he has been treated in the past was true.  And it is decidedly not.  For example, Plaintiff alleges that two female coworkers commented that he should not be alone with one of his current female consumers and infers that his coworkers believe men cannot interact professionally with female consumers.  Complaint ¶ 52.  Actually, they were concerned that specific consumer might accuse Mr. Morley of sexual misconduct if he met with her alone because she has serious mental health issues and has made accusations of sexual misconduct against numerous men who worked with her in other contexts in the past.  Declaration of Karen Blake-Orne, ¶ 7.

Plaintiff similarly suggests that he received poor feedback from a small percentage of employees during his April 2021 performance evaluation because of how he responded to the diversity training.  Complaint ¶¶ 62, 139–140.  To the contrary, more than half of respondents

answered "occasionally" or "no" when asked whether Plaintiff collaborates well with peers and partners, provides effective feedback, provides leadership to guide teams and individuals to work more effectively, and contributes to a positive team environment.  Declaration of Hibbard Doe ¶ 5.  And all of the responses were sent to Plaintiff's supervisor before the training.  *Compare id.* ¶ 3 (results sent on March 25, 2021) *with* Complaint ¶ 62 (alleging that the training began on March 29, 2021 and was completed on April 19, 2021).

Plaintiff also asserts that he improperly received supervisory feedback for sending confidential information to the personal email account of a former employee of a partner agency. Complaint ¶ 152.  He claims that the notes he sent did not include "any confidential information; only the initials of the consumers" and that other counselors "have made similar mistakes" but were treated differently.  *Id.* Both of these assertions are false.  The meeting invitation included the full first name of one of the individuals, as well as information that could potentially allow identification of the other individuals by the former employee.  Blake-Orne Decl., ¶ 8.  And Mr. Morley's supervisor has previously given supervisory feedback to a female counselor for a similar confidentiality breach.  *Id.* ¶ 9.

Plaintiff also posits that he received improper feedback in October 2021 about deciding to delay starting a master's program he is required to complete because he "notified DAIL" of his decision and his deadline "is three years away."  Complaint ¶ 155.  But Plaintiff did not tell his direct supervisor that he decided to drop out of the initial program after she signed off on all required forms for payment.  Blake-Orne Decl. ¶ 14.  And Plaintiff's supervisor was appropriately concerned about his decision because his November 1, 2024 deadline for completing a program that typically takes three years is less than three years away.  Indeed,

Plaintiff has now indicated that he plans to start a program next spring that the offering university estimates will take three years to complete online.  *Id.* ¶ 16.

Finally, Plaintiff's assertion that diversity training is religious indoctrination has no more merit for purposes of his Vermont Fair Employment Practices Act claim than it does for purposes of his federal claims because diversity training is not a religion.  *See, e.g., Sevier*, 302 F. Supp. 3d at 320-21 (rejecting claim that acceptance of homosexuality is a religion); *Altman*, 245 F.3d at 76 (rejecting argument that Earth Day violated Establishment Clause); *Daniel* 405 F. App'x at 506 (rejecting claim that "scientism" is a religion); *Peloza*, 37 F.3d at 520–21 (rejecting claim regarding "evolutionism"); *Allen*, 760 F.2d at 449–51 (rejecting claim regarding "nuclearism").

The sole case Plaintiff cites in the Vermont Fair Employment Practices Act claim portion of his motion is a Federal Title VII case, *EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377 (E.D.N.Y. 2016).  Plaintiff's attempted reliance on *United Health* confirms that the Court should "weed out [his] spurious" religion theory "on grounds of common sense." *Sevier*, 302 F. Supp. 3d at 320-21.  *United Health* involved a program implemented in significant part by "a spiritual advisor" and a record replete with emails discussing "God, spirituality, demons, Satan, divine destinies, the 'Source,' purity, blessings, and miracles."  213 F. Supp. 3d at 388-89.  Finally, as described below, there is no serious question that minorities with disabilities face significant, structural disadvantages throughout their lives, or that DVR should acknowledge and respond to that reality.

> **c.  The balance of the equities and public interest do not favor Plaintiff.**

Because he seeks to challenge a not yet written diversity plan that—if it ever affects him— will not affect him for at least a year, Plaintiff cannot begin to show that the balance of the

equities and public interest favor him. But even beyond that, he cannot show how it would serve
the public interest to enjoin DVR's efforts to explore how to better serve its clientele and support
its staff. DVR's mission is to help Vermonters with disabilities attain high-quality jobs and
pursue educational opportunities. Complaint, Ex. 6 at 3. DVR recognizes "that systemic racism
compounds the issues already faced by people with disabilities who are from racially or
ethnically marginalized groups." *Id.* at 4. Between 2016 and 2019, the percentage of DVR clients
who identified as racial minorities rose from 5% to 8%. *Id.* at 3. DVR therefore recognizes that,
as Vermont becomes more diverse, it increasingly needs to train its staff "around racial justice
and cultural competency" to better serve that increasingly diverse population. *Id.* at 4. Plaintiff's
suggestion that training DVR staff on issues around diversity, equity, and inclusion, or exploring
how to improve DVR's policies and procedures to better serve its clientele has "nothing to do
with DVR's mission, or DVR's employees' work with their clients," ECF 2 at 6, and would not
serve the public interest, does not withstand scrutiny.

The disadvantages of racial minority and disability status compound each other in ways that
certainly inform DVR's clients' lives, and should inform DVR's approach to serving its clients.
"Aside from the public health issues that most racial/ethnic minorities face, minorities with
disabilities experience additional disparities in health, prejudice, discrimination, economic
barriers, and difficulties accessing care as a result of their disability—in effect, they face a
'double burden.'" Garth Graham, *Assuring Health Equity for Minority Persons with Disabilities*,
U.S. Dep't of Health & Human Servs. Off. of Minority Health 11 (July 2011),
https://minorityhealth.hhs.gov/assets/pdf/checked/1/acmhhealthdisparitiesreport.pdf. The effects
of the additional prejudice and discrimination that people of color with disabilities face are stark.
"For example, Blacks/African Americans with Down syndrome are more than seven times as

likely as are Whites/Caucasians to die by age 20. The life expectancy for Whites/Caucasians

with Down syndrome is about 55 years compared to 25 years for Blacks/African Americans." *Id*.

Discrimination against people of color with disabilities begins early, resulting in higher rates

of, and harsher, school discipline—which can in turn lead to increased school dropout rates and

incarceration. *See, e.g.*, Daniel J. Losen, *The Need for Remedies to the Disparate Loss of*

*Instruction Experienced by Black Students with Disabilities* 2, 7 (Apr. 2018),

https://today.law.harvard.edu/wp-content/uploads/2018/04/disabling-punishment-report-.pdf;

(reporting that Black students with disabilities lost nearly three times as many days of instruction

nationwide as white peers with disabilities due to disparate discipline, and "rigorous studies have

established that removing students from instruction on disciplinary grounds is harmful in terms

of increased risk for dropping out . . . and future incarceration"); Travis Riddle & Stacey

Sinclair, *Racial Disparities in School-Based Disciplinary Actions Are Associated with County-*

*Level Rates of Racial Bias*, 116 Proc. of the Nat'l Acad. of Scis. 17 (Apr. 2019),

https://www.pnas.org/content/116/17/8255 (noting that "Black students in the United States are

subject to disciplinary action at rates much higher than their white counterparts," they "are more

likely to be seen as problematic and more likely to be punished than white students are for the

same offense," and these "disciplinary actions put students at higher risk for negative life

outcomes, including involvement in the criminal justice system"); Rachel Blick et al., *The*

*Double Burden: Health Disparities Among People of Color Living with Disabilities* 4 (2015),

https://nisonger.osu.edu/sites/default/files/u4/the_double_burden_health_disparities_among_peo

ple_of_color_living_with_disabilities.pdf ("African-American students in special education

experience additional disparate treatment;" they "are punished more harshly by teachers than

their white counterparts, increasing the likelihood of involvement in the juvenile justice

system."). This is not just a national trend—in Vermont, Native American and Black students and students with disabilities face disproportionately high rates of school discipline. Jay Diaz, *Kicked Out! Unfair and Unequal Student Discipline in Vermont's Public Schools* 11-14 (2015), https://hrc.vermont.gov/sites/hrc/files/Kicked-Out.pdf.

This discrimination continues in the workforce. People with disabilities are disproportionately unemployed—but because of the compounding barriers they face, people of color with disabilities are particularly likely to be unemployed. "Among persons with a disability, the jobless rates for Hispanics (16.8 percent), Blacks (16.3 percent), and Asians (15.7 percent) were higher than the rate for Whites (11.6 percent) in 2020." U.S. Bureau of Labor Stat., Persons with a Disability: Labor Force Characteristics – 2020, 3 (Feb. 24, 2021), https://www.bls.gov/news.release/pdf/disabl.pdf. The "barriers for people with disabilities include but are not limited to: discrimination, harassment, stigma, [and] insufficient vocational rehabilitative services." Blick et al. at 5. Additionally, structural racism prevents members of racial minorities "from obtaining the same employment opportunities as Caucasians, limiting their ability to earn living wages." Ruqaiijah Yearby, *The Impact of Structural Racism in Employment and Wages on Minority Women's Health*, 43 Am. Bar Assoc. Human Rights Mag., https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/the-state-of-healthcare-in-the-united-states/minority-womens-health/.

Moreover, both people with disabilities and people of color are disproportionately incarcerated. Laura M. Maruschak et al., *Disabilities Reported by Prisoners: Survey of Prison Inmates, 2016*, Bureau of Justice Statistics (Mar. 2021), https://bjs.ojp.gov/library/publications/disabilities-reported-prisoners-survey-prison-inmates-2016 ("State and federal prisoners (38%) were about two and a half times more likely to report a

disability than adults in the U.S. general population (15%).”); Bruce Western & Catherine Sirois, *Racial Inequality in Employment and Earnings after Incarceration* 1 (Feb. 2017), https://scholar.harvard.edu/files/brucewestern/files/racial_inequality_in_employment _and_earnings_after_incarceration.pdf (noting “imprisonment rates are five to eight times higher for African Americans than whites, and twice as high for Hispanics”). Previous incarceration poses a significant barrier to employment—a barrier that disproportionately affects previously incarcerated Black and Hispanic individuals, who have lower earnings than previously incarcerated white people even after “accounting for differences in health, human capital, criminal involvement, and the transition from prison to community.” Western & Sirois at 22.

DVR is not alone in believing rehabilitation counselors should be aware of, and responsive to, their clients’ cultural backgrounds and the barriers they face, including systemic discrimination. The Code of Professional Ethics for Certified Rehabilitation Counselors provides that rehabilitation counselors must “demonstrate respect for the cultural identity of clients in developing and implementing rehabilitation and treatment plans, and providing and adapting interventions,” must “develop and maintain knowledge, personal awareness, sensitivity, and skills and demonstrate a disposition reflective of a culturally competent rehabilitation counselor working with diverse client populations,” and must “not condone or engage in the prejudicial treatment of an individual or group based on their actual or perceived membership in a particular group, class, or category.” Code of Professional Ethics for Certified Rehabilitation Counselors, Standards A.2(a)-(b), D.2(a) (2017), https://crccertification.com/wp-content/uploads/2021/03/CRC_CodeEthics_Eff2017-FinaLnewdiesign.pdf. To achieve that, the standards recognize the need for training on issues around diversity, equity, and inclusion: “Rehabilitation counselors respect the diversity of clients and seek training in areas in which they

are at risk of imposing their values onto clients, especially when the rehabilitation counselor's values are inconsistent with the client's goals or are discriminatory in nature." *Id.*, Standard A.4.

Finally, Plaintiff's argument that DVR's efforts to train employees on reducing bias and improving equity, diversity, and inclusion in the workplace have "nothing to do with DVR's mission," ECF 2 at 6, is contrary to governing case law. The Second Circuit has recognized that a public-facing government entity, like DVR, has a responsibility to serve the public "fairly, even-handedly, and without bias." *Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir. 2002). For example, in a case involving a police officer who distributed racist literature, it observed that if an officer "treats a segment of the population of any race, religion, gender, national origin, or sexual preference, etc., with contempt, so that the particular minority comes to regard the police as oppressor rather than protector, respect for law enforcement is eroded and the ability of the police to do its work in that community is impaired" and "the department's ability to recruit and train personnel from that community will be damaged." *Id.* at 147. This is equally true in the context of vocational rehabilitation. DVR's "program is totally voluntary," so "people seek [its] services because they want to, not because of any mandate." Complaint, Ex. 6 at 3. If DVR did not work to improve its services for disadvantaged minority clients, and ensure that all consumers and employees are treated fairly and without bias, its ability to serve vulnerable Vermonters with disabilities would be impaired. Plaintiff cannot show that this would serve the public interest.

DATED at Montpelier, Vermont, this 22nd day of December 2021.

STATE OF VERMONT

THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL


By:    */s/ David Boyd*
       David Boyd
       Assistant Attorney General
       Rachel Smith
       Deputy Solicitor General
       Office of the Attorney General
       109 State Street
       Montpelier, VT 05609-1001
       (802) 828-1101
       david.boyd@vermont.gov
       rachel.e.smith@vermont.gov

       Counsel for Defendants